# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PHUC DOAN, Derivatively on Behalf of LUMBER LIQUIDATORS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MACON F. BROCK, JR., CARL R. DANIELS, JR., ROBERT M. LYNCH, DOUGLAS T. MOORE, JOHN M. PRESLEY, PETER B. ROBINSON, MARTIN F. ROPER, WILLIAM K. SCHLEGEL, THOMAS D. SULLIVAN, NANCY M. TAYLOR, JIMMIE L. WADE, and DANIEL E. TERRELL, <br><br> Defendants, <br><br> - and - <br><br> LUMBER LIQUIDATORS HOLDINGS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. _4:15 CV 25_ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> (1) **BREACH OF FIDUCIARY DUTY** <br> (2) **ABUSE OF CONTROL** <br> (3) **GROSS MISMANAGEMENT** <br> (4) **UNJUST ENRICHMENT** <br> (5) **INSIDER TRADING** <br><br> **DEMAND FOR JURY TRIAL** |

By and through his undersigned counsel, Plaintiff Phuc Doan, derivatively on behalf of Lumber Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company"), files this Verified Shareholder Derivative Complaint against the Individual Defendants (defined herein) for breaches of their fiduciary duties as directors and/or officers of Lumber Liquidators, abuse of control, gross mismanagement, unjust enrichment, and insider trading. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by Lumber Liquidators and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from the pending securities fraud class action, *Kiken v. Lumber Liquidators, Inc., et al.*, Case No. 4:13-cv-00157-AWA-DEM (Hon. Arenda L. Wright Allen) (the "Securities Class Action"); and e) review of other publicly available information concerning Lumber Liquidators and the Individual Defendants. Plaintiff believes that the factual allegations contained herein have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. In support thereof, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action seeking to redress wrongdoing by Lumber Liquidators' board of directors (the "Board") and certain senior officers (collectively, the "Individual Defendants") between February 22, 2012 and the present (the "Relevant Period"). During this time, the Individual Defendants breached their fiduciary duties owed to Lumber

Liquidators and its shareholders by causing the Company to violate federal and state laws. Indeed, during the Relevant Period, the Individual Defendants knew or recklessly disregarded the fact that lumber the Company was purchasing directly from mills in China did not comply with federal and state laws, including (a) California law (promulgated by the California Air Resources Board ("CARB")) that restricted the amount of formaldehyde permissible in hardwood flooring; and (b) federal law, which prohibited the Company from importing foreign wood that had been illegally harvested in violation of other countries' laws. Given the significantly reduced prices at which Lumber Liquidators was purchasing wood from mills in China and the significantly, materially higher margins the Company was enjoying over Competitors who also sold CARB-compliant wood, the Individual Defendants must have known the Company was purchasing non-compliant wood, since it was well known that prices for CARB-compliant wood significantly exceeded the price that Lumber Liquidators was paying for its wood and because Lumber Liquidators sources its wood *directly* from mills, mostly from China, and thus the Company deals directly with its mills and does not go through middlemen or distributors. Thus, the Individual Defendants named herein have direct knowledge of and communication with the mills. Indeed, in Lumber Liquidators' 2014 Annual Report filed with the U.S. Securities and Exchange Commission ("SEC") on Form 10-K in February 2015, the Company emphasized this point stating:

> "Sourcing directly from the mill and our unique store model provides the foundation for our value proposition, which we market aggressively to the homeowner, or a contractor on behalf of a homeowner."

2.     Further, wood is a commodity business.  Basic economic theory holds that businesses competing with respect to the sale of commodities should not be able to achieve widely disparate profit margins.  Yet, during the Relevant Period, Lumber Liquidators did exactly that, earning significantly higher gross margins than its major competitors (Home Depot

and Lowe's).   The Individual Defendants misrepresented that the Company's competitive advantage and the major driver of these high margins were "sourcing initiatives" implemented by the Company in China designed to reduce the cost of goods, cut out middlemen, increase control by the Company, and strengthen relationships with their suppliers.   In fact, as alleged herein, the Company was purchasing wood from suppliers in China that was illegally harvested from protected habitat in Russia and also buying wood from mills in China that contained dangerously high and illegal levels of formaldehyde.

3.     Given their direct contact with and supervision of the mills in China, and considering Lumber Liquidators operates as a single business segment and the wood the Company buys and sells is therefore the Company's "core product," the Individual Defendants knew or recklessly disregarded the fact that Lumber Liquidators' above-market profit margins were the result of buying tainted wood and not from any lawful "sourcing initiatives" implemented by the Company.

4.     Compounding the Company's woes, is the fact that throughout the Relevant Period, including up to the present, the Individual Defendants have caused Lumber Liquidators to make repeated, false or materially misleading representations and misstatements to the market, proclaiming that the Company has done nothing wrong despite widespread reports to the contrary.

5.     For example, *60 Minutes* ran a full-length exposé on March 1, 2015, detailing the Company's unlawful sourcing of lumber from China which contained unlawful levels of formaldehyde (backed by tests of the lumber performed by independent labs and admissions by workers at the Chinese mills that they were instructed to intentionally mislabel lumber ordered

by Lumber Liquidators as compliant with CARB).[1] The Company immediately filed a Form 8-K

with the SEC the day after the *60 Minutes* story ran, stating:

> In light of Sunday night's *60 Minutes* episode featuring Lumber Liquidators Holdings, Inc. ("the Company"), the Company is providing the following statement:
>
> "Lumber Liquidators is a leader in safety, as evidenced by our track record of providing our wide range of products to two million satisfied customers across America.
>
> We comply with applicable regulations set by the California Air Resources Board ("CARB"), which is currently the only regulator of composite core emissions. Although the CARB regulations only apply in California, we adhere to these standards everywhere we do business. Every manufacturer of fiberboard cores used in our products is certified in accordance with CARB regulations. We have documentation to support each step of our production process, including vendor agreements, vendor invoices, CARB certificates, and test results, to serve as further proof that our processes, practices and products are compliant across the board. Independent third-party test results are available on our safety website at www.lumberliquidators.com/safety.
>
> We believe that *60 Minutes* used an improper test method in its reporting that is not included in CARB's regulations and does not measure a product according to how it is actually used by consumers. Our laminate floors are completely safe to use as intended."

6.      While the Company immediately and publicly denied the allegations made in the

*60 Minutes* report, just two days later, the Company was forced to withdraw from participation in

the Raymond James Annual Institutional Investors Conference, a prominent conference the

Company had always attended. The same day — Wednesday, March 4, 2015 — U.S. Senator

Bill Nelson, a Florida Democrat, sent a letter to the heads of the Consumer Product Safety

Commission, the Centers for Disease Control and Prevention, and the Federal Trade Commission

---

[1] CARB requires all HWPW (Hardwood Plywood) products sold in the state of California to emit no more than 0.05 ppm (parts per million) of formaldehyde. Because violations threaten human health and welfare, violations of CARB regulations may result in severe penalties assessed against the offending entities.

demanding independent testing of Lumber Liquidators' laminate flooring to determine if it potentially poses a health risk to the public.  Further, a Senate Committee on Commerce, Science and Transportation statement revealed that Senator Nelson — the committee's ranking member — also wants to investigate whether Lumber Liquidators made false marketing claims about the flooring's compliance with the California formaldehyde safety standard.  Following this news, shares of Lumber Liquidators sank to their lowest levels in almost three years.

7.     Then, on or about March 22, 2015, the New York Daily News reported that Senator Chuck Schumer has asked for a federal probe into the safety of Lumber Liquidators' flooring imported from China mills.  Specifically, Senator Schumer demanded that the Consumer Product Safety Commission "launch an investigation to test the flooring and order it recalled if it is deemed to be unsafe."

8.     Needless to say, the damage wrought upon Lumber Liquidators by the Individual Defendants wrongdoing has been substantial.  In the last twelve months alone, upon revelations of the Individual Defendants' utter disregard of federal and state laws — and the safety, health, and well-being of the consumers to whom it sells its products — the Company's stock price has been punished, dropping more than $66 per share from its 52-week high price of $96.75 to close at $30.56 on March 27, 2015.  Stated differently, the Individual Defendants' actions have caused Lumber Liquidators' market capitalization to decrease by more than *$1.7 billion*.

9.     Not everyone was harmed by the Individual Defendants' actions.  Specifically, during the Relevant Period, certain Defendants *sold over one million Lumber Liquidators shares at inflated prices reaping more than $77.9 million.*

10.     In addition to the forgoing, and as is detailed more fully herein, the Individual Defendants breached their fiduciary duties during the Relevant Period by falsely representing

that the Company maintained adequate internal controls when, in fact, the Individual Defendants knew that such controls were materially deficient. The Individual Defendants further breached their fiduciary duties by causing the Company to misrepresent its financial results and misrepresent its compliance with CARB and other federal and state laws. The positive statements were materially false and misleading when made because Lumber Liquidators' officers and directors failed to disclose that the Company's purported growth and profits were achieved through an improper course of conduct, including sourcing wood from China which contained unlawful levels of formaldehyde and sourcing wood from a protected habitat in Russia. The Individual Defendants' public statements also concealed the material fact that the Company's failure to comply with federal and state rules and regulations posed a material risk to the Company. These violations of federal and state law have subjected the Company to being sued for securities fraud in this Court and exposed the Company to tens of millions of dollars in potential damages and fines for violations of the law. In addition to the federal securities class action lawsuit pending against it, and investigations of the Company by federal and state law enforcement agencies, the Individual Defendants' wrongdoing has caused Lumber Liquidators to be sued by consumers in individual and class action cases alleging product defects, false adverting, unfair business practices, and harm to consumers' health.

11.    The economic and reputational harm adversely impacting the Company is a direct result of the Director Defendants' (defined herein) wrongful course of bad faith conduct. Because each of them was directly involved in affirmative acts that perpetrated the wrongful conduct alleged herein, in breach of their fiduciary duties, they each are personally interested, not disinterested or independent, and a demand upon the Board to assert the claims herein would be a futile effort. Such a demand would require the Director Defendants, who face a substantial

risk of personal liability arising from their conduct, to evaluate whether to sue themselves, making it necessary for Plaintiff to "step into the shoes" of Lumber Liquidators and assert breach of fiduciary duty claims derivatively. Nor is the Director Defendants' conduct protected by valid business judgment.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper under 28 U.S.C. § 1332. Complete diversity exists between Plaintiff and defendants. Further, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this district under 28 U.S.C. § 1391 because: (a) Lumber Liquidators maintains its principal executive offices in this district; (b) one or more of the Defendants reside(s) in this district; (c) a substantial portion of the transactions and wrongs complained of herein — including the Individual Defendants' primary participation in the wrongful acts — occurred in this district; and (d) the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

14.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## THE PARTIES

15.     Plaintiff Phuc Doan is, and at all relevant times has been, a holder of Lumber Liquidators common stock. Plaintiff is a citizen of North Dakota.

16.     Nominal Defendant Lumber Liquidators Holdings, Inc. is a Delaware corporation with its principal place of business located at 3000 John Deere Road, Toano, Virginia, 23168. Lumber Liquidators is the largest specialty retailer of hardwood flooring in North America, and operates as a single business segment, with its call center, website, and customer service network supporting the retail store operations. The Company offers an extensive assortment of exotic and domestic hardwood species, engineered hardwood, laminate, vinyl plank, bamboo, and cork. Lumber Liquidators' stock is listed and traded on the NYSE under the ticker "LL" and, as of March 27, 2015, had more than 27 million shares outstanding. Lumber Liquidators is a citizen of Delaware and Virginia.

17.     Defendant Macon F. Brock, Jr. ("Brock") has been a Director of Lumber Liquidators since November 2007. Brock currently serves on the Company's Compensation Committee and the Nominating and Corporate Governance Committee, and served on these committees throughout the Relevant Period. Upon information and belief, Brock is a citizen of Virginia.

18.     Defendant Carl R. Daniels, Jr. ("Daniels") has been the Senior Vice President, Supply Chain of Lumber Liquidators since October 2011. Upon information and belief, Daniels is a citizen of Virginia.

19.     Defendant Robert M. Lynch ("Lynch") has been a Director of Lumber Liquidators since January 2012. He currently serves as President and Chief Executive Officer, and from January 2011 to January 2012, served as President and Chief Operating Officer. Upon information and belief, Lynch is a citizen of Virginia.

20.     Defendant Douglas T. Moore ("Moore") has been a Director of Lumber Liquidators since April 2006. Moore currently serves on the Company's Audit Committee and

the Nominating and Corporate Governance Committee, and served on these committees throughout the Relevant Period. Upon information and belief, Moore is a citizen of Richmond, Virginia.

21. Defendant John M. Presley ("Presley") has been a Director of Lumber Liquidators since April 2006. Presley currently serves on the Company's Audit Committee and the Nominating and Corporate Governance Committee, and served on these committees throughout the Relevant Period. Upon information and belief, Presley is a citizen of Virginia.

22. Defendant Peter B. Robinson ("Robinson") has been a Director of Lumber Liquidators since April 2010. Robinson currently serves on the Company's Compensation Committee, and served on this committee throughout the Relevant Period. Upon information and belief, Robinson is a citizen of Florida.

23. Defendant Martin F. Roper ("Roper") has been a Director of Lumber Liquidators since April 2006. Roper currently serves on the Company's Audit Committee and the Compensation Committee, and served on these committees throughout the Relevant Period. Upon information and belief, Roper is a citizen of Massachusetts.

24. Defendant William K. Schlegel ("Schlegel") has been the Chief Merchandising Officer of Lumber Liquidators since March 2011. Upon information and belief, Schlegel is a citizen of Virginia.

25. Defendant Thomas D. Sullivan ("Sullivan") is the founder and has been the Chairman of the Board of Directors since the Company's inception in 1994. Before September 2006, Sullivan also served as president and chief executive officer since incorporation in 1994. He currently advises and supports the marketing and advertising departments and is active in sourcing initiatives. He is involved with employee development initiatives and plays a key role

in setting and maintaining the Company's corporate culture.  In addition, he appears in some of the Company's advertising materials and participates in public relations events on the Company's behalf.  Upon information and belief, Sullivan is a citizen of Virginia.

26.     Defendant Nancy M. Taylor ("Taylor') has been a Director of Lumber Liquidators since April 2014.  Upon information and belief, Taylor is a citizen of Virginia.

27.     Defendant Jimmie L. Wade ("Wade") has been a Director of Lumber Liquidators since September 2011.  Wade currently serves on the Company's Audit Committee, and served on this committee throughout the Relevant Period.  Upon information and belief, Wade is a citizen of Virginia.

28.     Defendant Daniel E. Terrell ("Terrell") is the Company's Chief Financial Officer ("CFO").  Mr. Terrell has been the CFO since October 2006.  Prior to assuming this position, Mr. Terrell served as Controller from November 2004.  Upon information and belief, Terrell is a citizen of Virginia.

29.     Defendants Brock, Lynch, Moore, Presley, Robinson, Roper, Sullivan, Taylor, and Wade are collectively referred to as the "Director Defendants."

30.     Defendants Moore, Presley, Roper, and Wade are collectively referred to herein as the "Audit Committee Defendants."

31.     Defendants Daniels, Schlegel, and Terrell are collectively referred to as the "Officer Defendants."

32.     The Director Defendants and the Officer Defendants are collectively referred to as the "Individual Defendants."

## FACTUAL ALLEGATIONS
## BACKGROUND FACTS REGARDING LUMBER LIQUIDATORS' WOOD SOURCING

**A.** **Through Its Single Business Unit, Lumber Liquidators Sources Wood Directly from Mills in China**

33.     Lumber Liquidators and its subsidiaries operated 352 retail stores as of December 31, 2014, most located in the United States.  The Company is the largest specialty retailer of hardwood flooring in North America, and *operates as a single business segment*.  The Company's hardwood flooring offerings include various exotic and domestic hardwood species, engineered hardwood, laminate, vinyl plank, bamboo, and cork.

34.     Lumber Liquidators sources its wood directly from mills, mostly from China, and thus the Company does not source through middlemen or distributors.  The Company and the Individual Defendants named herein thus have direct knowledge of and communication with the mills.  In Lumber Liquidators' 2014 Annual Report filed with the SEC on Form 10-K, the Company emphasizes this point:

> "*Sourcing directly from the mill and our unique store model provides the foundation for our value proposition*, which we market aggressively to the homeowner, or a contractor on behalf of a homeowner."

35.     The Company's SEC filings during the Relevant Period, including its most recent filings, uniformly misrepresented that Lumber Liquidators was able to achieve profit margins significantly higher than its competitors due to its ability to lower costs by sourcing wood directly from mills.  For example, the Individual Defendants caused the Company to tout through its 2014 Annual Report (published in February 2015):

**Competitive Strengths**

*Our Value Proposition*

We compete across our value proposition with retailers ranging from the national home improvement chains to local flooring stores in each market. *The components of our value proposition include*:

- *Price.  **Our retail prices in each merchandise category are generally lower than our competitors**.  This pricing advantage is usually greatest in the premium products, and less at the entry or commodity level.  **We are able to maintain these prices by sourcing proprietary products direct from the mill, the singular focus of our supply chain on hard surface flooring and our highly profitable store model.***

- *Selection.*  We offer a broad assortment of flooring in varying widths, species and constructions, including solid and engineered hardwood, laminate, vinyl plank, bamboo and cork. We also offer an extensive selection of moldings and accessories, staircases and butcher block.  Our products are sold under proprietary brands across a range of price points that allow us to target discrete market segments and appeal to diverse groups of customers.

- *Quality.*  We invest significant resources to design and produce products of the highest quality, including our flagship Bellawood brand.  **We source directly from mills all over the world, and often are a mill's most significant relationship.**  Proprietary brands allow us greater control over product design and production, which **we monitor through an expansive network of experienced quality control and assurance professionals**.

36.    Further, the Individual Defendants caused the Company to represent in the 2014 Annual Report:

**Our Direct Sourcing Model**

*Supplier Relationships.  **We believe sourcing directly from mills enables us to offer a broad assortment of high-quality, proprietary products to our customers at a consistently lower cost than our competitors**.  We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost.  We believe our collaborative relationship enhances the mills' productivity, yield and financial flexibility, such that **we access lower net costs than our competitors**.  We are able to set demanding specifications for product quality **and our own quality control and assurance teams are on-site at certain mills, coordinating inspection and assurance procedures**.  We believe the advantages a mill gains by working with us attracts interest from around the world.  As a result, we have diversified our purchases across approximately 130 domestic and international mills.*

37.    As demonstrated herein, these statements were false and misleading, and the Individual Defendants knew or recklessly disregarded the falsity of these statements when

approving the issuance of the 2014 Annual Report.  The Company was only able to achieve lower costs by buying wood that the Individual Defendants knew was adulterated, unlawfully sourced, and tainted with unlawfully high levels of formaldehyde.  This knowledge of truth is demonstrated by the fact that Lumber Liquidators *operates a single business segment*, has direct relationships with its mills in China (indeed, as the Company stated in its Annual Report, Lumber Liquidators was frequently the mills' single biggest and most important client), and sent quality control professionals directly to the mills to inspect the wood and ensure its compliance with federal and state laws and regulations.

**B.    Federal and State Importing and Sourcing Laws Govern Lumber Liquidators' Operations and Sourcing of Wood from China**

38.    Under federal law, the Lacey Act, 16 U.S.C. §§ 3371–3378, imposes civil and criminal penalties for violations of a wide array of laws prohibiting trade in wildlife, fish, and plants that have been illegally taken, transported, or sold.

39.    In 2008, Congress amended the Lacey Act to add provisions banning the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws), and imposing civil and criminal penalties on violators.  The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, detailing the country of harvest, species, value, and quantity of each shipment.  The Lacey Act is enforced primarily by the U.S. Department of Agriculture ("DOA") and the U.S. Fish and Wildlife Service ("FWS") with support from the U.S. Department of Homeland Security ("DHS") and the U.S. Department of Justice ("DOJ").

40.    The Lacey Act is a fact-based statute with strict liability, subjecting violators to both criminal and civil sanctions even if they did not know that they were dealing with an illegally harvested product.  The Lacey Act also requires importers of covered products – in this

case, wood or wood products – to exercise "due care" in identifying the source of their goods. Penalties for violating the Lacey Act vary in severity based on the violator's level of knowledge about the products; penalties are higher for those who knew or should have known through the exercise of due care that they were trading in illegally harvested materials.

41.     The Russian Far East ("RFE") is an environmentally-sensitive area home to many endangered species. For example, the RFE contains the world's last major stands of old-growth temperate hardwood forests. Illegal loggers often target key hardwood species in the area, which are vitally important to the region's ecosystem.

42.     Russian law regulates the harvesting of wood from forests in the RFE, criminalizing the harvesting of wood in excess of stated permits and outside designated areas. Most commercially valuable timber in the RFE now exists only in protective forests. Most timber cut in the RFE is destined for export, and 96% of valuable hardwood exports flow directly across the border to China. Importing wood harvested in violation of this Russian law to the U.S. is a violation of the Lacey Act.

**C.      The Known, Harmful Effects of Formaldehyde and the Strict Regulations Concerning Formaldehyde Emissions in Products**

43.     Because formaldehyde causes cancer, laws also exist regulating the maximum amount of formaldehyde allowed in wood flooring sold by Lumber Liquidators.

44.     The Formaldehyde Standards for Composite-Wood Products Act was passed in 2010 (the "FSCWP Act"). This legislation, which adds a Title VI to the Toxic Substances Control Act ("TSCA"), establishes limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard, and particleboard.

45.     The national emission standards in the FSCWP Act are identical to standards previously established by CARB for products sold, offered for sale, supplied, used, or

manufactured for sale in California. The CARB standards have been in effect since January 1, 2009. CARB requires formaldehyde emission standard compliance from distributors and importers like Lumber Liquidators.

46.     CARB set limits on how much formaldehyde may be released from composite wood products, including hardwood plywood, medium-density fiberboard, particleboard, and finished goods containing these products that are sold, supplied, offered for sale, manufactured, or imported in the United States. The rules include additional implementing provisions addressing testing requirements, laminated products, product labeling, chain of custody, recordkeeping, stockpiling, and enforcement.

47.     Specifically, CARB dictates that all HWPW (Hardwood Plywood) products sold in the state of California should emit no more than 0.05 ppm (parts per million) of formaldehyde. Violations of CARB regulations may result in severe penalties assessed against the offending entities.

48.     CARB also established a third-party certification framework designed to ensure that manufacturers of composite wood products meet the CARB formaldehyde emission standards by having their composite wood products certified though an accredited third-party certifier. Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emission standards for their products.

**D.      The Individual Defendants Were Aware of Red Flags, Including that, Despite Selling a Commodity, Lumber Liquidators Posted Profit Margins Significantly Higher than its Larger and More Efficient Competitors**

49.     In addition to being subject to the federal and state regulatory laws described above, wood is a commodity business. As such, Lumber Liquidators operates in a highly-competitive industry. Under established economic theory, businesses competing with respect to the sale of commodities should not be able to achieve widely disparate profit margins. Yet, both

leading up to and during the Relevant Period, Lumber Liquidators did exactly that, earning significantly higher gross margins than its major competitors, Home Depot and Lowe's, both of which are larger than Lumber Liquidators, have a larger international presence, and can therefore leverage their larger size to reduce costs to a greater extent than Lumber Liquidators. Indeed, Lumber Liquidators enjoys only an 11% market share, while Home Depot and Lowe's control 27% of the market.

50.     Further, from least 2007 through 2011, Lumber Liquidators, Lowe's, and Home Depot all reported gross margins of 34% - 35% each year. Thus, through 2011, Lumber Liquidators' gross margins were almost identical to those of Home Depot and Lowe's.

51.     As is detailed further herein, following 2011, however, Lumber Liquidators began to buy wood from mills in China that was unlawfully sourced and which did not comply with CARB due to high formaldehyde levels. Such wood was significantly cheaper than lawfully sourced and CARB-compliant wood, and thus caused Lumber Liquidators' profit margins to increase significantly.

**E.     The Company's Sourcing Initiatives**

52.     Beginning in 2011, Lumber Liquidators began a "sourcing initiative" designed to increase its gross margin by reducing the costs associated with the wood it sourced through China. The Company sought to accomplish this by, among other things: (1) cutting out middleman suppliers; (2) increasing control and oversight of vendor mills and manufacturers; and (3) doing "line reviews" in which the Company would award business to the mills and manufacturers willing to provide wood at the lowest price. The Company referred to these strategies to reduce the cost of wood as its "sourcing initiative."

53.     Defendants Lynch and Schlegel were put in charge of the sourcing initiative. They had both been hired in 2011 as President and Senior Vice President of Merchandising, respectively. Defendant Schlegel is the head of the Company's sourcing operations.

54.     On September 28, 2011, the Company entered into an agreement to acquire certain assets of Sequoia Floorings ("Sequoia") relating to Sequoia's quality control and assurance, product development, and logistics operations in China.  Prior to its acquisition, Sequoia, a trading company, provided sourcing services on approximately 78% of the Company's 2011 merchandise purchases from China.  As a part of the transaction, the Company established a representative office in Shanghai in October 2011, and assumed direct control of sourcing previously managed by Sequoia.

55.     With the acquisition of Sequoia, the Company began eliminating distributor middlemen and establishing – as described by Defendant Lynch – a "fully direct relationship" with the mills in China.

56.     The Company also began "line reviews" in which it pitted suppliers against each other to bid for the Company's business, increasing/consolidating business with mills and manufacturers that could provide the lowest price and eliminating relationships with others. Many of the vendors that had the lowest prices were Chinese mills.  The Company was able to get "very significant cost concessions from these vendors."  As a result, the Company began shifting more of its sourcing to Chinese mills, many of which the Company had never worked with prior to the Sequoia acquisition.  In 2011, the Company's top 10 suppliers accounted for approximately 70% of the Company's supply purchases.  Approximately 42% of the Company's product was sourced from China.  That figure increased to 50% in 2013.

57.     In particular, while gross margins for Home Depot and Lowe's remained between 34.3% and 34.8% for the years 2012 and 2013, Lumber Liquidators' gross margins increased to 41.8% by the third quarter of 2013.

**F.     Fueled by the High Profit Margins, the Company's Stock Increases from $19 to $115 in Less than Two Years**

58.     As a result of the supercharged profit margins (fed by the Company's unlawfully sourced wood), the Company's stock price experienced a meteoric rise, rising from $19.17 to a high of $115.44 in less than two years.  The Individual Defendants caused the Company to espouse how the Company's competitive advantage and the major driver of these high margins were "sourcing initiatives" implemented by the Company in China, which sourcing initiatives were designed to reduce the cost of goods, cut out middlemen, increase control by the Company, and strengthen relationships with its suppliers.  In reality, however, as detailed herein, the Company was purchasing wood from suppliers in China that was illegally harvested from protected habitat in Russia.  And the Company was also buying wood from mills in China that contained dangerously high and illegal levels of formaldehyde.

59.     Given their direct contact with and supervision of the mills in China, and the fact that Lumber Liquidators operates as a single business segment and thus the wood that the Company buys and sells is the Company's "core product," the Individual Defendants knew or recklessly disregarded the fact that Lumber Liquidators' above-market profit margins were the result of buying tainted wood (whose price was below market precisely because it was obtained through unlawful sourcing or manufacturing) and not from any lawful "sourcing initiatives" implemented by the Company.  The Individual Defendants had actual knowledge of the market prices from China for wood that complied with regulations regarding formaldehyde promulgated by CARB, and knew that the below-market prices Lumber Liquidators was paying its mills could

not be for truly CARB-compliant wood since truly compliant CARB wood cost significantly more than what Lumber Liquidators was paying.

60.     Indeed, as discussed below, *60 Minutes* demonstrated this point in its March 1, 2015 story on Lumber Liquidators, when it interviewed workers at one of Lumber Liquidators' China mills.   The workers stated that CARB-compliant wood costs significantly more to manufacture than non-CARB-compliant wood.

**G.     The Individual Defendants Knew of and Were Directly Involved with the Company's Sourcing of Wood from China**

61.     Defendant Lynch and Schlegel were directly involved in choosing wood suppliers for the Company and personally visiting mills and manufacturers in China on multiple occasions between 2011 and 2013.   For example:

(a)     During an analyst conference on September 7, 2011, then-CEO Jeffrey W. Griffiths stated:   "We brought in our President, Rob Lynch and our Senior VP of Merchandising, Bill Schlegel.  Both of them have extensive experience in direct sourcing in China and they are actually both there in China today working on some of those initiatives."

(b)     During an analyst conference on June 6, 2012, Defendant Lynch stated: "The Sequoia acquisition got us closer to a lot of our factories in China.  We actually then went forward and conducted our bamboo line review in China, in country that was wonderful.  I mean, we got to see factories we've never seen before."

(c)     During the July 25, 2012 Q2 earnings call, Defendant Lynch stated: "As our Chief Merchant, Bill Schlegel, and his teams have dug in with the vendors and done these line reviews."

(d)     And during an analyst conference on March 4, 2013, Defendant Terrell stated: "This is our breakdown of the key components of cost of sales.  Cost of product is at the base.  You can see it was fairly steady, 55.4%, 55.8%, 55.6% for three years.  And then we improved the merchandising department. Rob [Lynch] came in 2011.  Brought a new Chief Merchant, Bill Schlegel with him, and you start to see the benefiting cost of product of our sourcing initiatives.  From vendor allowances to line reviews to direct sourcing, 54.2% in 2011 down to 52.2% in 2012."

62.     The acquisition of Sequoia also provided the Company with – as described in the Company's 2011 Form 10-K – "direct servicing of mill relationships" in China.

63.    The Company did not rely on the distributors to monitor the sourcing practices at the mills in China. Instead, as admitted by Defendant Lynch during a July 24, 2013 analyst conference, the Company monitored sourcing directly, with "onsite controls" at the mills. The lumber was tested by the Company both at the mill as well as off-site in the Company's own labs. The Company also performed random tests of the wood at the mill. These procedures purportedly gave the Company (as Defendant Lynch described it) "insight and visibility throughout the sourcing process."

64.    Defendant Lynch has also admitted he and Schlegel were personally well aware of the workings at the mills in China. During an August 14, 2013 analyst conference, in response to an analyst question requesting additional detail about the Company's "sourcing strategies and any advantage you have there," Lynch stated:

> We absolutely have a world-class sourcing team. Our chief merchant, Bill Schlegel, and the team that he has built under him is better than I've ever seen in my career. . . . In fact, we just did a line review recently in the last couple of weeks over in China. We did an engineered line review and some of the feedback we got from the mills were how impressed they were with how closely we work with them, how we are out in the markets, in their territories, walk in their mills with them, interacting with them and building those relationships.

65.    In addition, Defendant Lynch traveled to China several times a year to oversee issues regarding Lumber Liquidators' purchase of wood from mills there. Similarly, Defendant Schlegel and his direct report, John Jakob (Vice President of Supply Chain/Manufacturing Operations) traveled to China regularly to oversee operations, find new Chinese suppliers, and report back to Defendant Lynch.

66.    Defendant Schlegel was responsible for quality assurance of the wood that Lumber Liquidators purchased from mills in China.

**H.** **The Individual Defendants Knowingly or Recklessly Caused the Company to Purchase Wood from the RFE During the Relevant Period Exposing the Company to Liability Under the Lacey Act**

67. To reduce costs and increase gross margins as part of its "sourcing initiatives," the Company purchased timber illegally sourced from the Russian Far East, exposing it to liability and enforcement under the Lacey Act.

68. Defendants' illegal sourcing and fraudulent reporting under the Lacey Act has been confirmed by a multi-year undercover investigation by the Environmental Investigation Agency ("EIA"). From 2011 through 2013, in the face of continued reports of extremely high levels of illegal forest degradation in the RFE by Chinese vendors, EIA systematically investigated the nature of the crimes. EIA was able to determine the path of the illegal timber and wood products throughout the global supply chain.

69. Despite the pressure and dangers involved, many individuals in the RFE, including foresters, local nonprofit organizations, police officers, game wardens, and individual citizens, worked at high personal risk to expose the illegal logging trade. Based on communications with these partners, EIA investigators were able to highlight the loggers, sawmills, and traders operating in Russia that were associated with illegal sourcing.

70. EIA investigators concurrently analyzed customs data to determine the largest players in the export of precious hardwoods from the RFE into China and the U.S. (among other countries). These data sets from Russia, China, and the U.S. provide detailed information about species, quantities, exporters, and importers involved in the trade of wood products. By cross-referencing these sets of data, EIA was able to develop a list of the Chinese manufacturers that imported large amounts of wood from high-risk exporters in Russia. EIA then established a cover company and contacted these Chinese companies as potential buyers of wood flooring products from the United States. EIA investigators visited ten of these companies in person in

China as well as their mills in Russia. In these conversations, EIA asked about their knowledge of illegal logging in Russia, their own exposure to that illegal logging, and how they interacted with their customers, particularly customers from the United States. EIA subsequently detailed these results in a report. Then, on October 9, 2013, EIA published an article about the report entitled "*Lumber Liquidators Importing Illegal Hardwood Flooring*." Upon information and belief, the EIA report and article were brought to the Board's attention, and therefore had actual knowledge of the allegations of the Company's illegal importation of hardwood flooring.

71.     The EIA investigation revealed Lumber Liquidators' primary supplier for hardwood flooring, Xingjia, is also the dominant player in the cross-border trade of illegal timber between the RFE and China. According to EIA investigators, both U.S. import records and undercover visits with Xingjia confirmed Xingjia's largest customer is Lumber Liquidators.

72.     As Lumber Liquidators has stated in its SEC filings, any single mill may provide as much as 4% of its hardwood purchases. Xingjia owns and operates three factories in northeast China as well as at least 14 sawmills in the RFE province of Khabarovsk.

73.     In or about late 2011, the president of Xingjia, Mr. Sun, gave the EIA investigators (who were posing as buyers) a tour of Xingjia's operations in Russia and openly revealed during their very first meeting that much of Xingjia's operations involved illegally harvesting protected wood in Russia and that they also were illegally over-harvesting wood on their own land in China.

74.     Specifically, Mr. Sun along with other Xingjia officials, openly described Xingjia's detailed system for sourcing illegal timber — illegally cutting outside of their concession boundaries, overcutting within those boundaries, and purchasing over 90% of their stocks from trading companies throughout the RFE that do not provide the required proof of

legality of sourcing. Xingjia officials also openly admitted to EIA investigators, posing as buyers, that Xingjia's illegal operations were facilitated through bribery of, and high-level political connections with, both Russian and Chinese officials.

75.     Many suppliers identified by Xingjia also have strong ties to illegal logging. For example, three employees of one supplier identified by Xingjia, including its head of timber harvesting, were sentenced to prison in 2010 for illegal logging, and more company employees are currently under investigation. Another supplier is the target of an investigation into illegal logging. These are the two largest cases of illegal logging to be uncovered in Khabarovsk Province during the past three years, and both firms under investigation (Beryozoviy and Investstroy) are Xingjia suppliers. According to EIA investigators, Xingjia openly acknowledged these companies as sources for its wood.

76.     Xingjia's connection to illegal sourcing would be obvious to anyone doing business with Xingjia. The EIA report also identifies how numerous sources throughout the RFE reported to undercover EIA investigators that at least 80% of all trees harvested in the area are done so illegally. Also, a simple Russian-language Google search for Xingjia's suppliers, such as "Investstroy logging Khabarovsk," brings up news articles describing recent illegal logging violations on the first page of results.

77.     Indeed, Lumber Liquidators has sourced hardwood flooring through Xingjia *since at least 2007* and, as described above, the Company strengthened its control over its suppliers in China through the purchase of Sequoia in 2011, its Shanghai-based quality control manager. Additionally, the Company's quality control teams conducted routine visits to mills and manufacturers *and* senior management, including Defendant Lynch and the Company's head of sourcing, Defendant Schlegel, also made regular visits.

78. The Company's increase in control is confirmed by Xingjia's president and manager of Russian operations, Mr. Sun, who admitted that, after Lumber Liquidators' purchase of Sequoia, the Company assumed a more direct role in supply chain management in China. Mr. Sun confirmed that *since 2011, high level management from Lumber Liquidators visited Xingjia and its mills in the RFE on multiple occasions*.

79. Specifically, in late 2011, during the tour Mr. Sun gave the EIA investigators (who were posing as buyers) of Xingjia's operations in Russia, Mr. Sun admitted that he gave a similar tour to a high-level U.S. management team of senior executives from Lumber Liquidators. Mr. Sun reportedly told undercover investigators that the "head of sourcing" for Lumber Liquidators was on the tour, and said the executive had previously worked for Home Depot. According to Lumber Liquidators' SEC filings, Defendant Schlegel is the Company's Chief Merchandising Officer and previously worked at Home Depot for nearly 10 years, holding "global procurement and merchandising roles."

80. During their visit, EIA investigators observed stacks of pallets of Lumber Liquidators' Virginia Mill Works hand-scraped solid oak flooring outside the factory, ready for export. Inside the factory, the entire production line was working hard filling the rest of this particular Lumber Liquidators' order.

81. Mr. Yu, who manages Xingjia's Dalian facilities and is the brother-in-law of Xingjia President Mr. Sun, told EIA investigators that the raw material for these shipments included oak from Russia. During a second visit to Dalian Xingjia in early 2012, Mr. Yu stated that around half of the oak used in flooring for Lumber Liquidators came from Russia. Reportedly, Mr. Yu openly admitted that Xingjia "misdeclared" the source of wood for its products. Mr. Yu has further admitted his company declared Russian wood as Chinese wood for

tax purposes as well as to avoid scrutiny from enforcement agencies because any wood that is declared as Russian in origin receives intense scrutiny due to the high likelihood of illegal harvesting.

82.     When Mr. Yu was asked if Lumber Liquidators was aware of this illegal harvesting activity, Mr. Yu said, "Yes, of course they know that."

83.     During its visits, the EIA obtained eleven samples of boards and manufactured flooring by the Suifenhe and Dalian facilities of Xingjia.  Five of these eleven samples were cut from a batch of flooring that EIA investigators personally observed Xingjia workers preparing for shipment to Lumber Liquidators.  The EIA sent these samples to a respected laboratory with decades of expertise in stable isotopic analysis for testing.  Preliminary results from stable isotopic analysis indicated that every sample provided originated in the RFE.  For 18 out of 20 of these samples, the analysis gave a confidence level of 95% or greater.  These results indicate that all of the samples received from Xingjia were sourced from the forests of Khabarovsk Province – the forests where Xingjia openly admitted to be engaged in illegally sourcing, and where its suppliers have previously been convicted of, or are currently suspected of, illegal logging.

84.     Mr. Sun told EIA investigators that he and his managers gave a tour similar to the one given to EIA investigators to a high-level team of U.S. executives from Lumber Liquidators during a visit in early 2012, which included Lumber Liquidators' U.S. "head of sourcing" operations – Defendant Schlegel – as well as two representatives from the Company's Shanghai office.  According to Mr. Sun, this tour included a trip to Xingjia's operations in Khabarovsk, visiting sawmills, and meeting with local officials in the RFE.

85.     Mr. Yu, who accompanied these officials on their visit, reported Lumber Liquidators officials were not troubled at all by what they saw.  Instead, Lumber Liquidators has

expanded its relationship with Xingjia.  For example, Mr. Yu explained to EIA investigators Lumber Liquidators was moving its production of hand-scraped solid oak flooring from multiple suppliers to Xingjia and, in May 2012, Lumber Liquidators' head of sourcing operations visited Xingjia's offices and sawmills in the RFE to ensure that Xingjia's oak "supply was secure for a long time."

86.     U.S. import records confirm imports of solid oak flooring from Xingjia have not only continued, but have increased, since the Company's May 2012 visit.  Based on U.S. custom forms, EIA investigators estimate Lumber Liquidators has received at least 35 separate shipments, containing nearly three million square feet, of hand-scraped solid oak flooring from Xingjia, alone, from May 2012 until August 2013.  By 2013, Xingjia was Lumber Liquidators' chief Chinese supplier of hand-scraped solid oak flooring.

87.     Indeed, the EIA investigation demonstrates that the Individual Defendants knew or recklessly disregarded the fact that the Company purchased illegally sourced wood, in violation of federal law, during the Relevant Period.

## THE INDIVIDUAL DEFENDANTS CAUSED LUMBER LIQUIDATORS TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

88.     Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to the Individual Defendants and/or recklessly disregarded by them.

89.     Indeed, during the Relevant Period, as is detailed more fully herein, the Individual Defendants caused the Company to misrepresent its financial results and misrepresent its compliance with CARB and other federal and state laws.  The positive statements were materially false and misleading when made because the Individual Defendants failed to disclose

that the Company's purported growth and profits were achieved through an improper course of conduct, including sourcing wood from China which contained unlawful levels of formaldehyde and sourcing wood from Russia from protected habitat. The Individual Defendants' public statements also concealed the material fact that the Company's failure to comply with federal and state rules and regulations posed a material risk to the Company. The Individual Defendants knew or recklessly disregarded the fact that Lumber Liquidators' above-market profit margins were the result of buying tainted and not from any lawful "sourcing initiatives" implemented by the Company.

**A.      The Individual Defendants Cause the Company to Issue Financial Results for 2011, Reporting Significantly Increased Margins Due to Its Sourcing Initiatives**

90.      On February 22, 2012, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter and year ending December 31, 2011. For the quarter, the Company reported net income of $8.5 million, or $0.30 per diluted share, and $174.5 million in net sales. Gross margin for the fourth quarter 2011 was 35.5% compared to 34.0% in the fourth quarter 2010. The Company attributed the increase in gross margin in part to the "lower product costs due primarily to the continued implementation of sourcing initiatives." For the year, the Company reported net income of $26.3 million, or $0.93 per diluted share, and net sales of $681.6 million. Gross margin for the year increased to 35.3% compared to 34.8% in 2010.

91.      On February 22, 2012, the Individual Defendants caused the Company to file an annual report with the SEC on a Form 10-K for the year ended December 31, 2011. The 2011 Form 10-K reiterated the Company's previously reported financial results and financial position. In addition, the 2011 Form 10-K contained certifications signed by Lynch and Terrell pursuant to

Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), through which each individual affirmed he had examined the 2011 Form 10-K and that, among other things:

- the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the] report";

- "the financial statements, and other financial information included in [the] report, fairly present in all material respects the financial condition, results of operations and cash flows [of the Company]"; and

- The Company has disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the [Company's] internal control over financial reporting."

92.   Regarding the Company's sourcing, the 2011 Form 10-K stated:

> Our value proposition to the customer is a key driver of our business. Important components include:
>
> - Price.  *A fundamental part of our business model is to provide quality hardwood flooring at everyday low prices.  We are able to maintain these prices across our product range because we generally purchase flooring directly from mills.* . . . .
>
> - Quality.  *We believe that we have achieved a reputation for quality, and that our proprietary brands are recognized for excellence by our customers.  We work directly with our supplier mills to source and produce flooring that will meet our high quality standards.* . . .

93.   Further, regarding the Company's suppliers, the 2011 Form 10-K provided:

> We work directly with a select group of vendors and mills with whom we have cultivated relationships that provide for a consistent supply of high-quality product at the lowest prices. *As part of ensuring the high-quality nature of our brands, we have developed demanding product standards.  . . .  We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our specifications.*

> . . . In 2011, one of the trading companies, Sequoia Floorings Inc. ("Sequoia"), provided services on approximately one-third of our merchandise purchases, primarily in Asia. In September 2011, we entered into an agreement to acquire certain assets of Sequoia relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in China. Our top 10 suppliers, including Sequoia, accounted for approximately

70% of our supply purchases in 2011. *We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances.* . . . .

94.     With regard to government regulation, the 2011 Form 10-K stated:

We are subject to extensive and varied federal, provincial, state and local government regulation in the jurisdictions in which we operate, including laws and regulations relating to our relationships with our employees, public health and safety, zoning and fire codes. *We operate each of our stores, offices, finishing facility and distribution centers in accordance with standards and procedures designed to comply with applicable laws, codes and regulations.*

. . .

Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating forestry and the environment. *We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.* We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. *Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.*

Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. *We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*

We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations. . . . .

95.     The 2011 Form 10-K attributed the increase in the Company's gross margins primarily to the Company's close and direct oversight of its suppliers through its "sourcing initiatives." The 2011 Form 10-K described the Company's sourcing initiatives as follows:

*Sourcing Initiatives.* In 2011, we began a process which will continually challenge the structure of our sourcing relationships with our vendor-mill partners and ultimately strengthen our relationships with the best international and domestic partners, and eliminate weaker sources. *Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment and will continue to result in lower net product costs, enabling us to strengthen the value proposition to our customer.* These initiatives are segregated into three primary phases, implemented independently over a multi-year time frame, which are as follows:

- Vendor-mill partners participate to varying levels in a range of continuing programs, including specific promotions designed to create incremental customer traffic, volume based discounts and sharing of certain costs, including marketing, product samples and new store openings.

- Current and potential vendor-mill partners participate in competitive "line reviews" of specific merchandise categories. *During these line reviews, management and vendor-mill partners evaluate breadth of assortment, quality, logistics and product cost to broaden and diversify our supply base, increase product quality and reduce product cost.*

- *Through our own international sourcing operations and working directly with our vendor-mill partners, we can better control product cost and quality, enhance forecasting and broaden our product assortment.* . . . .

96.     The 2011 Form 10-K was signed by or on behalf of each of the Director Defendants except Defendant Taylor.

97.     The same day, the Company held an investor conference call to discuss the fourth quarter and fiscal year ended 2011 financial results. On the call, Lynch emphasized that the Company would continue to "focus on sourcing" in China, which would be key to the Company's future financial results:

We will continue to execute the strategy we've pursued over the last year, conducting line reviews and expanding our product assortments. We expect to further leverage our China office following our acquisition last year. And we will continue to work closely with our vendor partners to develop strong, long-term relationships.

98.     Terrell echoed Lynch's remarks, asserting these sourcing initiatives would lead to a lower cost of product and higher margins, and stating that "where our sourcing initiatives either allow us to reduce certain basic stocking levels or the product will come from a new source in 2012, often at a lower cost." Terrell continued: "I think the real long-term benefit is that ability to be closer to the mill, challenge the purchase cycle, look at broad-based assortment of lower-cost products. And that's what is ahead of us in 2012. So it certainly gave us some lift in 2011, but the real power is coming in 2012."

**B.     The Individual Defendants Cause the Company to Issue 2012 Financial Results, Again Boasting Significant Margins Due to its Sourcing Initiatives**

99.     On February 20, 2013, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter and year ending December 31, 2012. For the quarter, the Company reported net income of $13.8 million, or $0.50 per diluted share, and $210.7 million in net sales. Gross margin for the fourth quarter 2012 was 39.1% compared to 35.5% in the fourth quarter 2011. The Company once again attributed the increase in gross margin in part to the "generally lower product costs due to sourcing initiatives." For the year, the Company reported net income of $47.1 million, or $1.68 per diluted share, and net sales of $813.3 million. Gross margin for the year increased to 38.0% compared to 35.3% in 2011.

100.    On February 20, 2013, the Individual Defendants caused the Company to file an annual report with the SEC on a Form 10-K for the year ended December 31, 2012. The 2012 Form 10-K reiterated the Company's previously reported financial results and financial position and was signed by or on behalf of each of the Director Defendants except for Defendant Taylor. In addition, the 2012 Form 10-K contained certifications signed by Lynch and Terrell pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), substantially and materially the same as the certifications set forth in paragraph 91, above.

101.    The 2012 Form 10-K listed the Company's sourcing directly from the mills as one of the Company's "competitive strengths":

> We believe that our sourcing directly from the mill provides the foundation for the strongest value proposition in a highly-fragmented hardwood flooring market. We strengthen and support that value proposition with a unique store model, proprietary brands, extensive customer education and sales support resources and a comprehensive marketing and advertising strategy.

> ***Sourcing Direct from the Mill***

> *Our Suppliers.* We believe that our vertically integrated business model enables us to offer a broad assortment of high-quality products to our customers at a lower cost than our competitors. We work directly with a select group of vendors and mills with whom we have cultivated strong relationships that provide for a consistent supply of our products. ***We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our demanding product specifications, which support the high-quality nature of our brands.*** We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. . . .

> . . .

> *Sourcing Initiatives.* In 2011, we began a process to continually challenge, and ultimately strengthen, the structure of our sourcing relationships with the best international and domestic mills. ***Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs.*** These initiatives are segregated into three primary areas, which are being implemented independently over a multi-year time frame, as follows:

> - Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings;

> - Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

> - Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

102.    Regarding government regulation, the 2012 Form 10-K stated:

We are subject to extensive and varied federal, provincial, state and local government regulation in the jurisdictions in which we operate, including laws and regulations relating to our relationships with our employees, public health and safety, zoning and fire codes. *We operate each of our stores, offices, finishing facility and distribution centers in accordance with standards and procedures designed to comply with applicable laws, codes and regulations.*

. . . .

*Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.* We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. *Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.*

Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*

We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations. . . . .

103.  The 2012 Form 10-K also reported the Company's gross margin benefitted from a reduction in the "cost of product" resulting from the Company's "sourcing initiatives":

*"Cost of Product*: In both 2012 and 2011, gross margin benefited from our sourcing initiatives and shifts in our sales mix. Our sourcing initiatives, originally launched in the first quarter of 2011, include vendor allowances, line reviews and increases in the percentage of product we source direct from the mill. . . .

In September 2011, we entered into an agreement to acquire certain assets of Sequoia Floorings Inc. ("Sequoia") relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in

China. We believe our cost of product was reduced, primarily in 2012, due to both the net cost reduction of owning those services and the benefits of working directly with the mills.

104. The same day, the Company held an investor conference call to discuss the fourth quarter and fiscal year ended 2012 financial results. On the call, Lynch once again emphasized that the Company's "source initiatives" have "continued to contribute significantly to [the Company's] gross margin expansion:

> Ongoing line reviews and product assortment evaluations have remained critical in our ability to align with customer preferences and flooring trends and these initiatives remain top priorities. We have been pleased with the reduction in product cost, but equally as important, our people have forged stronger relationships with our mills to deliver a broader assortment, enhanced availability and stronger control over product quality.

105. Terrell echoed Lynch's remarks, agreeing the Company's "sourcing initiatives" contributed to the lowered product costs:

> Sourcing-initiatives favorable to gross margin included the net benefit of direct relationships with our vendor mills, competitive line reviews and vendor cost sharing primarily through certain allowances. . . . Looking back over the two years since initial implementation, our cost of product for the full year 2012 is 200 basis points lower than the full year 2011 and 340 basis points lower than the full year 2010. We believe these sourcing initiatives have not only lowered product costs, they have facilitated the assortment expansion of premium products and enhanced product availability.

## C. The Individual Defendants Cause the Company to Issue 2013 Financial Results

106. On February 19, 2014, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter and year ending December 31, 2013. For the quarter, the Company reported net income of $20.8 million, or $0.74 per diluted share, and $258.4 million in net sales. Gross margin for the fourth quarter 2013 was 40.8% compared to 39.1% in the fourth quarter 2012. The Company attributed the increase in gross margin in part to the "generally lower net product costs." For the year, the Company reported net income of

$77.4 million, or $2.77 per diluted share, and net sales of $1.0 billion. Gross margin for the year increased to 41.1% compared to 38.0% in 2012.

107. On February 19, 2014, the Company filed an annual report with the SEC on a Form 10-K for the year ended December 31, 2013, which was signed by, among others, Defendants Brock, Lynch, Moore, Presley, Robinson, Roper, Sullivan, Wade, and Terrell. The 2013 Form 10-K reiterated the Company's previously reported financial results and financial position. In addition, the 2013 Form 10-K contained certifications signed by Lynch and Terrell pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), substantially and materially the same as the certifications set forth in paragraph 91, above.

108. The 2013 Form 10-K once again listed the Company's direct sourcing from the mills as one of the Company's "competitive strengths":

> We believe our value proposition to the customer is the most complete and the strongest within a highly-fragmented hardwood flooring market. *Sourcing directly from the mill provides the foundation for this value proposition*, strengthened by our unique store model and the industry expertise of our people.

> ***Our Value Proposition***

> We compete across our value proposition with retailers ranging from the national home improvement chains to the local flooring store in each market. We believe we have an advantage in comparison to our competition and in aggregate, the most complete solution for the residential consumer in search of hard surface flooring. The components of our value proposition include:

> - **Price.** Our retail prices in each merchandise category are generally lower than our competitors. This pricing advantage is usually greatest in the premium products, less at the entry or commodity level. *We are able to maintain these prices through our direct sourcing model, including the relationship with the mill*, the proprietary products we develop and sell, the singular focus of our supply chain on flooring and our highly profitable store model.

> . . .

- **Quality**.  We invest significant resources to design and produce products of the highest quality, including our flagship Bellawood brand.  *We source directly from mills all over the world, and often are a mill's most significant relationship.*  Proprietary brands, supported by these relationships, allow us greater control over product design and production, *which we monitor through an expansive network of experienced quality control and assurance professionals positioned both at the mill and at our distribution facilities.*

. . .

### Our Direct Sourcing Model

*Supplier Relationships.  We believe sourcing directly from mills enables us to offer a broad assortment of high-quality, proprietary products to our customers at a consistently lower cost than our competitors.*  We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost.  We believe our collaborative relationship enhances the mills' productivity, yield and financial flexibility, such that we access lower net costs than our competitors.  *We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at the mills, coordinating inspection and assurance procedures.  . . . We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.  . . . .*

In 2011, we began a process to continually challenge, and ultimately strengthen, the structure of our sourcing relationships with the best international and domestic mills.  *Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment, while reducing product costs.*  These initiatives, now a continuous and integral part of our sourcing strategy and process, can be segregated into three primary areas:

- Volume-based discounts and cost sharing for a range of continuing programs, including marketing, product samples and new store openings.

- Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost.

- Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

*We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition. The scale of our purchasing and diversity of products require sustainable forestry. We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers not adhering to our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product.*

109.    With regard to government regulation, the 2013 Form 10-K provided:

We are subject to extensive and varied federal, provincial, state and local government regulations in the jurisdictions in which we operate, including laws and regulations relating to our relationships with our employees, public health and safety, zoning and fire codes. *We operate each of our stores, offices, finishing facility and distribution centers in accordance with standards and procedures designed to comply with applicable laws, codes and regulations.*

. . .

*Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. We consult with our suppliers, as appropriate, to ensure that they are in compliance with their applicable home country laws.* We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. *Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.*

Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. *We work closely with our suppliers in order to comply with the applicable laws and regulations in these areas.*

We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources. . . .

110.    Notably, the section in 2013 Form 10-K dealing with government regulation, while mirroring the 2011 Form 10-K and 2012 Form 10-K in all other respects, omitted the following emphasized language from the last paragraph quoted above:

We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, ***and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations***.

**D.     February 25, 2015 False and Misleading Statements**

111.    On February 25, 2015, the Individual Defendants caused the Company to issue a press release announcing its financial results for the quarter and year ending December 31, 2014. For the quarter, the Company reported net income of $17.3 million, or $0.64 per diluted share, and $272.0 million in net sales.  Gross margin for the fourth quarter 2014 was 39.2% compared to 40.8% in the fourth quarter 2013.   For the year, the Company reported net income of $63.4 million, or $2.31 per diluted share, and net sales of $1.05 billion.  Gross margin for the year decreased to 39.9% compared to 41.1% in 2013.

112.    On February 25, 2015, the Company filed an annual report with the SEC on a Form 10-K for the year ended December 31, 2014, which was signed by, among others, Defendants Brock, Lynch, Moore, Presley, Robinson, Roper, Sullivan, Wade, Taylor, and Terrell. The 2014 Form 10-K reiterated the Company's previously reported financial results and financial position.  In addition, the 2014 Form 10-K contained certifications signed by Lynch and Terrell pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), substantially and materially the same as the certifications set forth in paragraph 91, above.

113.    The 2014 Form 10-K once again listed the Company's direct sourcing from the mills as one of the Company's "competitive strengths":

***Our Value Proposition***

We compete across our value proposition with retailers ranging from the national home improvement chains to local flooring stores in each market. The components of our value proposition include:

- **Price**. Our retail prices in each merchandise category are generally lower than our competitors. This pricing advantage is usually greatest in the premium products, and less at the entry or commodity level. *We are able to maintain these prices by sourcing proprietary products direct from the mill*, the singular focus of our supply chain on hard surface flooring and our highly profitable store model.

  . . .

- **Quality**. We invest significant resources to design and produce products of the highest quality, including our flagship Bellawood brand. *We source directly from mills all over the world, and often are a mill's most significant relationship.* Proprietary brands allow us greater control over product design and production, *which we monitor through an expansive network of experienced quality control and assurance professionals.*

  . . .

### Our Direct Sourcing Model

*Supplier Relationships. We believe sourcing directly from mills enables us to offer a broad assortment of high-quality, proprietary products to our customers at a consistently lower cost than our competitors.* We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. We believe our collaborative relationship enhances the mills' productivity, yield and financial flexibility, such that we access lower net costs than our competitors. *We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at certain mills, coordinating inspection and assurance procedures.* . . .

*We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.* As a result, our top 20 suppliers accounted for approximately 62% of our supply purchases in 2014 and our largest mill partner represented approximately 7%. . . .

*We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition.* With over 310 million square feet of flooring sold through over 620,000 customer transactions in 2014, the scale of our purchasing and diversity of products require sustainable forestry. *We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers that are unable to meet our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product.*

114.    With regard to government regulation, the 2014 Form 10-K provided:

We are subject to extensive and varied federal, provincial, state and local government regulations in the jurisdictions in which we operate, including laws and regulations relating to our relationships with our employees and customers, public health and safety, zoning, accommodations for person with disabilities, and fire codes. *We operate each of our stores, offices, finishing facility and distribution centers in accordance with standards and procedures designed to comply with applicable laws, codes and regulations.* . . .

Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating labor, forestry and the environment. *We consult with our suppliers, as appropriate, to ensure that they are in compliance with their applicable home country laws.* We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. *Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.*

Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. *We work closely with our suppliers in order to comply with the applicable laws and regulations in these areas.*

We monitor changes in applicable laws and regulations and believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources. . . ."

115.    Notably, the section in 2014 Form 10-K dealing with government regulation, while mirroring the 2011 Form 10-K and 2012 Form 10-K in most respects, omitted the following emphasized language from the last paragraph quoted above:

We . . . believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources, *and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition or results of operations.*

## REASONS STATEMENTS WERE IMPROPER

116.    The true facts, which were known or were recklessly disregarded by the Individual Defendants but concealed from the investing public, were as follows:

(a)    the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act;

(b)    the Company's products failed to comply with applicable laws and regulations governing formaldehyde emissions from composite wood products under the CARB standards;

(c)    the Company misrepresented the country of harvest on custom forms, failing to indicate that the wood in the products had been harvested from the RFE, in violation of the Lacey Act;

(d)    the Company had inadequate internal controls for ensuring compliance with the Lacey Act and the CARB standards;

(e)    the decrease in the Company's cost of product and increase in margins were achieved as a result of violations of the Lacey Act and the CARB standards;

(f)    a substantial portion of the Company's earnings and revenues were thereby earned as a result of the violation of these laws;

(g)    the Company's gross margin expansion was not sustainable, and the Company faced the risk of large fines, penalties, forfeitures, judgments, and/or settlements in connection with government regulatory actions and/or consumer class actions related to its practices; and

(h)    as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

117.    As a result of the Individual Defendants' false and misleading statements and omissions, Lumber Liquidators shares traded at artificially inflated prices during the Relevant

Period. Once the true facts regarding the Company's illegal behavior and violation of federal and state law emerged, Lumber Liquidators stock crumbled erasing more than a billion dollars in market capitalization.

### THE TRUTH SLOWLY EMERGES

**A.     June 20, 2013 Disclosure that the Company's Products Were Not CARB-Compliant and Contained High Levels of Formaldehyde**

118.    On June 20, 2013, an article published on *SeekingAlpha.com* revealed that, among other things, testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5x the maximum legal limit even though the product was labeled as being CARB-compliant.

119.    The article explained that the investigation into the quality of the Company's wood sourced from China came about as a result of the Company's explanation for how it has been able to continually produce record gross margins:

> The Company's stock has been on a tear, rallying 300% over the last year, primarily on dramatic expansion of its gross and net margins. Management has often made reference to the significance of its acquisition of Sequoia Floorings Inc., based in Shanghai, as a primary reason for the tremendous improvement in margins. Sourcing product in China is certainly hardly unknown to competitors, and skeptics have wondered how an $8 million acquisition could have such a dramatic effect on gross margin and bottom line, and more importantly, enable Lumber Liquidators to undercut fierce price competitors such as Home Depot (NYSE: HD) and Lowe's (NYSE: LOW).

120.    Samples of Lumber Liquidators' house branding floor ("Mayflower" brand), which was imported from China and purchased from a Southern California Lumber Liquidators' retail store, was provided to Berkeley Analytical, an IAS accredited testing laboratory. Samples from the same package were also submitted to NTA, one of the "gold standard" labs for the National Wood Flooring Association. Each lab independently confirmed that the product was in

violation of the legal limit for formaldehyde. While the CARB standards require all Hardwood Plywood products sold in the state of California to emit no more than 0.05 ppm (parts per million) of formaldehyde, the samples tested emitted 0.17 ppm.

121.    On this news, the Company's stock price declined $9.40, or 10.9%, from $86.03 on June 19, 2013, to $76.63 on June 21, 2013, on unusually high trading volume.

**B.      Federal Authorities Raid Lumber Liquidators' Corporate Offices**

122.    On September 26, 2013, agents from the DHS, FWS, and DOJ executed sealed search warrants at Lumber Liquidators' corporate offices in Toano and Richmond, Virginia, related to the importation of certain wood products.

123.    On September 27, 2013, in a press release, the Company stated:

> Lumber Liquidators (NYSE: LL), the largest specialty retailer of hardwood flooring in North America, today commented on actions taken by Federal authorities, which relate to the importation of certain of the Company's wood flooring products. Yesterday, sealed search warrants were executed at the Company's corporate offices in Toano and Richmond, Virginia by the Department of Homeland Security's Immigration and Customs Enforcement and the U.S. Fish and Wildlife Service. The Company takes its sourcing and compliance very seriously, and is cooperating with authorities to provide them with requested information.

124.    On this news, the Company's stock price declined $5.83 (5.2%) from $112.96 on September 26, 2013, to $107.13 on September 27, 2013, on unusually high trading volume.

125.    In the same press release that announced the raid by the federal authorities, the Company continued to deny any impropriety as to the sourcing of their products:

> Due to the scale of its international and domestic operations, ***Lumber Liquidators has policies and procedures in place for the sourcing, harvesting and manufacturing of its products designed to comply with federal and other regulations related to the importation of wood flooring products.*** The Company has more than 60 professionals around the world who perform and monitor those processes. ***Quality is a key component of Lumber Liquidators' value proposition, and through its commitment to continuous improvement, the Company invests significant resources for quality control and assurance.***

126.    On October 9, 2013, the Wall Street Journal reported that the EIA had provided copies of the findings in the EIA Report to federal authorities prior to the government raid.  It cited an unnamed source that the federal agents who conducted the raid "were looking for evidence the [Company] had imported wood products from forests in far eastern Russia."

C.    **Presentation by Hedge Fund Manager Whitney Tilson**

127.    On November 21, 2013, well known hedge fund manager Whitney Tilson criticized the Company for importing illegally sourced timber from Russia in direct violation of U.S. laws.   Analyzing the Company's dramatic increase in margins since 2011, and the Company's assertion that it is a result of the Sequoia acquisition and other sourcing initiatives, Mr. Tilson sought to answer the question "How could a tiny $8 million acquisition have such a big impact???", observing:  "It's not like directly sourcing wood from mills in China is some great secret, unavailable to Home Depot, Lowe's and others . . ..."  Discussing the EIA's report and the federal government's September 26, 2013 raid on the Company, Mr. Tilson demonstrated that the Company was only able to maintain its unbelievably high margins, and thus inflate its revenues, as a result of importing illegal timber.

128.    For example, Mr. Tilson concluded that "While the largest mill supplying [Lumber Liquidators] only accounts for 4% of LL's hardwood purchases, I think it is likely that a meaningful percentage of the 51% of [Lumber Liquidators'] wood sourced in Asia is from Chinese mills that are trafficking in illegal wood."

129.    On this news, the Company's stock price declined $13.55 (11%) from $115.36 on November 21, 2013, to $101.81 on November 22, 2013, on unusually high trading volume.

D.    **The *60 Minutes* Exposé and Calls for Further Investigations**

130.    On March 1, 2015, *60 Minutes* ran a full-length exposé on Lumber Liquidators, detailing the Company's unlawful sourcing of lumber from China which contained unlawful

levels of formaldehyde, backed by tests of the lumber performed by independent labs and admissions by workers at the Chinese mills that they were instructed to intentionally mislabel lumber ordered by Lumber Liquidators as compliant with CARB.

131.    The exposé included undercover interviews with workers at one of Lumber Liquidators' China mills. During the interviews, the workers at the mill readily admitted that the wood was not CARB-2 compliant and that they just slapped a CARB-2 compliant sticker on the wood. The workers stated that CARB-compliant wood costs significantly more to manufacture than non-CARB-compliant wood.

132.    On March 2, 2015, the very next business day after the *60 Minutes* story ran, the Company filed a Form 8-K with the SEC stating:

> In light of Sunday night's *60 Minutes* episode featuring Lumber Liquidators Holdings, Inc. ("the Company"), the Company is providing the following statement:
>
> "Lumber Liquidators is a leader in safety, as evidenced by our track record of providing our wide range of products to two million satisfied customers across America.
>
> We comply with applicable regulations set by the California Air Resources Board ("CARB"), which is currently the only regulator of composite core emissions. Although the CARB regulations only apply in California, we adhere to these standards everywhere we do business. Every manufacturer of fiberboard cores used in our products is certified in accordance with CARB regulations. We have documentation to support each step of our production process, including vendor agreements, vendor invoices, CARB certificates, and test results, to serve as further proof that our processes, practices and products are compliant across the board. Independent third-party test results are available on our safety website at www.lumberliquidators.com/safety.
>
> We believe that *60 Minutes* used an improper test method in its reporting that is not included in CARB's regulations and does not measure a product according to how it is actually used by consumers. Our laminate floors are completely safe to use as intended."

133.    However, despite such immediate denial, the Company was forced to withdraw just two days later from participation in the Raymond James Annual Institutional Investors

Conference, a prominent conference that the Company had always attended.  On March 4, 2015, the Company issued another Form 8-K attaching a press release which announced the Company's last-minute cancellation of its attendance at the Raymond James conference (scheduled for that day) and included the following comment from Defendant Lynch, President and Chief Executive Officer: "'We regret that we are not attending the conference today and apologize to our investors that planned to attend.'"

134.    The same day — Wednesday, March 4, 2015, U.S. Senator Bill Nelson sent a letter to the heads of the Consumer Product Safety Commission, Centers for Disease Control and Prevention, and the Federal Trade Commission calling for independent testing of Lumber Liquidators' laminate flooring to see if it potentially poses a health risk to the public.  "Because this could affect millions of homeowners, it's imperative we get some answers quickly," Senator Nelson said.

135.    A statement from the Senate Committee on Commerce, Science and Transportation said that the senator — the committee ranking member — also wants to determine if Lumber Liquidators made potentially false marketing claims about the flooring's compliance with the California formaldehyde safety standard.

136.    Upon this news, the Company's stock dropped $5.14, or 13%, to close at $35.64 on March 4, 2015.

137.    Thereafter, on or about March 22, 2015, the New York Daily News published an online article in its digital edition, reporting that Senator Chuck Schumer has asked for a federal probe into the safety of Lumber Liquidators' flooring imported from China mills.  Specifically, Senator Schumer took the position that the Consumer Product Safety Commission "should launch an investigation to test the flooring and order it recalled if it is deemed to be unsafe."

Further, the New York Daily News article noted how the "recent '60 Minutes' report found flooring made in China and sold by ... [the Company] contained dangerously high levels of formaldehyde, a carcinogen."

138.    The next trading day, the Company's stock dropped even further, closing at $30.56 on March 27, 2015 — down over $66 per share from the stock's 52-week high.

## INSIDER SELLING ALLEGATIONS

139.    Not all stockholders were harmed by the Individual Defendants' actions. Indeed, some of the Individual Defendants made illegal use of their insider knowledge of the false and misleading statements about the Company's business.

140.    Specifically, Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel, fully aware of the unlawful basis driving the Company's stock to highly inflated levels, engaged in insider selling, selling off large portions of their Lumber Liquidator stock for proceeds of *over $77.9 million*:

| Defendant | Date Sold | Number of Shares | Price per Share | Total Value | Shares Owned Following Transaction |
|---|---|---|---|---|---|
| Douglas T. Moore | 2012-08-16 | 11,810 | $45.2400 | $ 534,284.0000 | 13,102 |
| | 2012-08-16 | 3,190 | $45.6000 | $ 145,464.0000 | 9,912 |
| | 2013-05-24 | 10,547 | $86.6800 | $ 914,214.0000 | 1,965 |
| | 2014-02-26 | 3,565 | $111.4520 | $ 397,328.0000 | 1,400 |
| | 2014-08-07 | 2,100 | $55.0300 | $ 115,563.0000 | 2,911 |
| | 2014-08-27 | 2,200 | $58.3891 | $ 128,456.0000 | 2,911 |
| | 2014-11-18 | 3,000 | $53.0161 | $ 159,048.0000 | 2,911 |
| | 2014-11-26 | 1,200 | $62.7815 | $ 75,337.8000 | 2,911 |
| TOTAL | | 37,612 | | $2,469,694.8000 | |
| | | | | | |
| John M. Presley | 2012-11-01 | 4,000 | $57.1259 | $ 228,504.0000 | 27,773 |
| | 2013-04-30 | 3,000 | $81.7507 | $ 245,252.0000 | 24,773 |
| | 2013-05-28 | 3,739 | $86.5411 | $ 323,577.0000 | 22,491 |
| | 2013-11-13 | 26,385 | $7.5800 | $ 199,998.0000 | 48,876 |
| | 2013-11-13 | 26,385 | $116.5650 | $3,075,580.0000 | 22,491 |
| TOTAL | | 63,509 | | $4,072,911.0000 | |
| | | | | | |
| Carl R. Daniels | 2012-11-20 | 9,025 | $54.2545 | $ 489,647.0000 | 0 |
| | 2013-11-18 | 9,025 | $119.3000 | $1,076,680.0000 | 2,465 |

| Defendant | Date Sold | Number of Shares | Price per Share | Total Value | Shares Owned Following Transaction |
|---|---|---|---|---|---|
| | 2014-03-01 | 560 | $107.2800 | $   60,076.8000 | 2,371 |
| **TOTAL** | | **18,610** | | **$1,626,403.8000** | |
| | | | | | |
| Thomas D. Sullivan | 2012-11-26 | 92,000 | $53.7200 | $4,942,240.0000 | 1,017,000 |
| | 2012-11-26 | 8,000 | $54.6937 | $   437,550.0000 | 1,009,000 |
| | 2012-11-28 | 100,000 | $53.2901 | $5,329,010.0000 | 909,998 |
| | 2013-05-03 | 95,857 | $81.8844 | $7,849,190.0000 | 813,141 |
| | 2013-05-03 | 40,000 | $82.3796 | $3,295,180.0000 | 773,141 |
| | 2013-05-06 | 38,643 | $82.4790 | $3,187,240.0000 | 734,498 |
| | 2013-05-06 | 25,500 | $83.2964 | $2,124,060.0000 | 708,998 |
| | 2013-08-22 | 30,000 | $100.4910 | $3,014,720.0000 | 678,998 |
| | 2013-08-22 | 25,000 | $101.5240 | $2,538,100.0000 | 653,998 |
| | 2013-08-22 | 45,000 | $102.3690 | $4,606,600.0000 | 608,998 |
| **TOTAL** | | **500,000** | | **$37,323,890.0000** | |
| | | | | | |
| William K. Schlegel | 2013-07-29 | 15,591 | $93.3521 | $1,455,450.0000 | 3,689 |
| | 2014-03-01 | 636 | $107.2800 | $   68,230.1000 | 3,868 |
| | 2014-08-26 | 1,287 | $58.0500 | $   74,710.4000 | 2,581 |
| | 2015-03-01 | 215 | $51.8600 | $   11,149.9000 | 3,330 |
| **TOTAL** | | **17,729** | | **$1,609,540.4000** | |
| | | | | | |
| Daniel E. Terrell | 2012-11-07 | 116,960 | $57.8581 | $6,767,080.0000 | 50,000 |
| | 2013-08-01 | 21,750 | $97.3958 | $2,118,360.0000 | 52,981 |
| | 2014-03-04 | 678 | $107.2800 | $   72,735.8000 | 52,885 |
| **TOTAL** | | **139,388** | | **$8,958,175.8000** | |
| | | | | | |
| Robert M. Lynch | 2013-05-14 | 51,157 | $89.8621 | $4,597,080.0000 | 58,716 |
| | 2013-05-15 | 10,500 | $90.1238 | $   946,300.0000 | 58,716 |
| | 2013-05-15 | 18,343 | $89.0561 | $1,633,560.0000 | 69,216 |
| | 2013-05-23 | 9,600 | $86.3125 | $   828,600.0000 | 39,116 |
| | 2013-05-23 | 4,500 | $83.7778 | $   377,000.0000 | 54,216 |
| | 2013-05-23 | 5,500 | $85.2636 | $   468,950.0000 | 48,716 |
| | 2013-05-24 | 4,900 | $87.0137 | $   426,367.0000 | 34,216 |
| | 2013-07-24 | 10,000 | $94.9900 | $   949,900.0000 | 34,216 |
| | 2013-07-24 | 10,000 | $95.7500 | $   957,500.0000 | 44,216 |
| | 2013-07-31 | 10,000 | $96.5000 | $   965,000.0000 | 34,216 |
| | 2013-07-31 | 10,000 | $97.9000 | $   979,000.0000 | 54,216 |
| | 2013-07-31 | 10,000 | $97.2500 | $   972,250.0000 | 44,216 |
| | 2014-02-21 | 7,630 | $103.1140 | $   786,761.0000 | 24,216 |
| | 2014-02-21 | 67,491 | $103.0500 | $6,954,950.0000 | 31,846 |
| **TOTAL** | | **229,621** | | **$21,843,218.0000** | |
| | | | | | |
| **GRAND TOTAL** | | **1,006,469** | | **$77,903,833.8000** | |

141. On the basis of non-public, material information, Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel sold 1,006,469 shares of their personally held Lumber Liquidators stock for proceeds of $77,903,833.80. Because of their positions with the Company, and their access to non-public, material information available to them but not to the public, Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

142. The above stock transactions during the Relevant Period by Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel were unusual and well-timed to take advantage of the Company's inflated stock price before the fraud was revealed to the market, indicating knowledge that the Individual Defendants' statements had inflated the Company's stock price.

## A. Transactions by Defendant Lynch

143. As of May 2013, Defendant Lynch held 34,000 shares of unrestricted stock (all but 7,147 of which had been granted to him by the Company). He also owned 130,040 options with a strike price of $26.73.

144. Prior to May 2013, Lynch's lone stock sale occurred on January 17, 2012, when he sold 1,492 shares for $19.94 per share under Transaction Code "F," indicating that the sale was for "Payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."

145. Lynch's trading changed dramatically in May 2013, when the Company's stock reached unprecedented heights as a result of the fraud. For example, between May 14, 2013 and July 31, 2013, Lynch engaged in a wholesale selloff of stock, exercising 129,960 — or 99.94% — of his vested options, selling the shares for a total of $12,000,831.39, and reaping an instantaneous profit of $8,525,931.39. During this time, Lynch also sold an additional

24,500 shares of stock for $2,100,917.03. By the time the government raided the Company's headquarters on September 26, 2013, Lynch owned only 10,000 shares of unrestricted stock.

**B.     Transactions by Defendant Terrell**

146.    Defendant Terrell has been with the Company since 2006. Prior to November 2012, Terrell owned 170,122 vested stock options (150,405 of which had vested by March 2011), and he had independently purchased 7,000 shares of stock. During this six-year-and-four-month period, Terrell did not exercise a single option or sell a single share of stock. On November 7, 2012, after the Company's stock price had increased from $19.17 per share at the start of the Relevant Period to $58.04 per share, Terrell exercised over 94% of his vested options, selling 116,960 shares of stock at an average price of $57.858 per share, for a total of $6,767,071.68 – an immediate profit of $5,873,675.99. On July 31, 2013, after additional options vested in March 2013, Terrell exercised another 21,750 options, selling them for an average price of $97.3958 per share, for a total of $2,118,358.65 and a profit of $1,692,588.55. Following the July 31, 2013 transaction, Terrell had exercised over 97% (all but 5,367) of his vested options. In total, between November 7, 2012 and July 31, 2013, Terrell sold a total of 138,710 shares, for a total of $8,885,430.33 and a profit of $7,566,264.54.

**C.     Transactions by Defendant Sullivan**

147.    Upon the Company's purchase of Sequoia on September 28, 2011, Defendant Sullivan held 2,199,801 shares of Company stock. During the Relevant Period (when the stock price was inflated by the Individual Defendants' false and misleading statements), Sullivan did not purchase a single share of stock. Rather, following the acquisition of Sequoia, between November 11, 2011 and September 26, 2013 (when federal agents raided the Company's corporate offices), Sullivan sold 1,590,803 shares – over 72% of his holdings – for a total of $60,216,632.10. Sullivan's last sale was on August 22, 2013, just one month before the raid.

**D.      Transactions of Defendant Schlegel**

148.    As of July 29, 2013, Defendant Schlegel owned 15,591 vested stock options. Prior to this date (and prior to the Relevant Period), Schlegel had not sold a single share of stock or exercised a single option.  On July 29, 2013, he exercised every last one of his vested options and sold all 15,591 shares at an average price of $93.3521 per share, for a total of $1,455,452.59 and an instant profit of $1,076,997.44.   Following this transaction, Schlegel owned only 685 shares that were not restricted.

**E.      Coordination of Transactions by the Individual Defendants and Other Insiders**

149.    When transactions of insiders are examined together, a suspicious pattern of sales emerges.  Between May 3, 2013 and May 24, 2013, when the Company's stock was hitting record highs, fluctuating between $81.90 and $89.91, the following insider transactions occurred:

- Defendant Sullivan sold 200,000 shares for $16,455,671.13;

- Defendant Lynch sold 104,500 shares for $9,277,848.42;

- Marco Pescara (Chief Marketing Officer) sold 28,199 shares for $2,533,292.81;

- E. Jean Matherne (Senior V.P.) sold 7,124 shares for $594,511.34;

- Livingston B. Haskell (Secretary and General Corporate Counsel) sold 2,500 shares for $223,125;

- Defendant Moore sold 10,547 shares for a total of $914,213; and

- Defendant Presley sold 3,739 shares for $323,577.

In total, these insiders sold 356,607 shares for $30,322,238.70 during this three-week period.

150. Similarly, between July 24, 2013 and August 5, 2013, immediately after announcing record results on July 24, 2013, which resulted in a one-day $6.00 increase and record stock prices as high as $96.82 per share, the following insider transactions occurred:

- Defendant Lynch sold 50,000 shares for $4,823,900;

- Defendant Terrell sold 21,750 shares for $2,118,358.65;

- Defendant Schlegel sold 15,591 shares for $1,455,452.59;

- Pescara sold 6,012 shares for $584,667; and

- Haskell sold 5,000 shares for $482,250.

In total, these insiders sold 98,353 shares for $9,464,628.24 during this 12-day window. Moreover, on August 22, 2013, Defendant Sullivan sold 100,000 shares for an additional $10,159,420.

151. After the above transactions, the following were the holdings of each insider:

- Pescara held only 3,001 shares (having sold 87,381 shares during the Relevant Period);

- Matherne held only 4,000 shares (having sold 13,109 shares during the Relevant Period);

- Haskell held only 2,095 shares (having sold 7,500 shares during the Relevant Period); and

- Defendant Moore held only 1,965 shares (having sold 25,547 shares during the Relevant Period)

152. Management's coordinated and wholesale disposal of securities during summer 2013 before the revelation of the fraud did not go unnoticed by analysts. On May 29, 2013, an article appeared in *Barron's* titled "*Lumber Liquidators Execs Sell Near All-Time High: Seven*

*insiders sold $30.3 million in shares of the flooring retailer*," detailing how "[f]rom May 6 through 28, seven insiders including the company's founder and top executive sold 355,909 shares to the tune of $30,259,377, an average of $85.02 each", including 200,000 shares by Sullivan and 104,500 shares by Lynch. *InsiderScore*, which monitors and reports on trading activity by company insiders, also noted the unusual stock sales.

## THE STOCK REPURCHASES

153.    While the Company's shares were trading at artificially inflated prices, the Director Defendants caused the Company to engage in a stock repurchase plan, pursuant to which they authorized repurchase of the Company's shares in the amount up to $150 million.

154.    On February 22, 2012, the Company announced that the Board authorized a stock repurchase program to repurchase up to $50 million in the Company's common stock.

155.    On November 15, 2012, the Company announced that the Board increased the repurchase authorization by an additional $50 million in common stock.

156.    On February 19, 2014, the Company announced that the Board further increased the repurchase authorization by an additional $50 million in common stock.

157.    The following table represents the Company's stock repurchase activity through the quarter ending December 31, 2014:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2014** | **2013** | **2012** |
| **Shares Repurchased** | 671,200 | 403,630 | 1,648,777 |
| **Average Price per Share** | $77.68 | $84.40 | $29.74 |
| **Total Aggregate Costs** | $52,138,000 | $34,066,000 | $49,068,000 |

158.    Thus, in total, while the Individual Defendants were issuing false and misleading statements during the Relevant Period, the Director Defendants caused the Company to repurchase *2,723,607 shares for $135,272,000.*

159.    Despite the Board's knowledge of the true facts about the Company's business and financial prospects, the Board authorized the Company's purchases of its own stock at artificially inflated prices.   The Board's decision was not the product of a valid business judgment because the Board knew that the Company's stock was significantly inflated due to the false and misleading statements.   The Board also knew or should have known that the Company's purported growth and profits were not sustainable and were achieved only through an improper course of conduct, including sourcing wood from China which contained unlawful levels of formaldehyde and sourcing wood from Russia from protected habitat.

160.    During 2013 and 2014, the Board caused the Company to repurchase its stock at significantly inflated prices.  Once the true facts emerged, the Company's stock plunged, trading at $33.32 per share as of March 6, 2015.  By repurchasing the stock at $84.40 and $77.68 per share, the Director Defendants caused the Company to significantly overpay for its stock.

161.    Because the price of the Company's shares was artificially inflated due to the concealment and misrepresentations by the Individual Defendants, the Company materially overpaid for its own stock. The repurchases falsely signaled to the Company's shareholders and the public that the purchase of the Company's stock at those prices was the best use of the Company's cash and that purchases of the stock at the market price prevailing at that time represented a good value for the Company.  Thus, the Director Defendants breached their fiduciary duties by causing the Company to purchase its own shares at artificially inflated prices.

## THE INDIVIDUAL DEFENDANTS' UNJUST COMPENSATION

162.    During the Relevant Period, the Officer Defendants were motivated to line their own pockets by keeping Lumber Liquidators' stock price artificially inflated.    Indeed, the Company's compensation program specifically incentivized the Officer Defendants to realize and sustain certain financial metrics such as operating income and EPS and rewarded them handsomely for meeting those metrics.

163.    During the Relevant Period, despite having direct responsibility for decisions concerning the Company's sourcing of wood from China, Defendants Terrell, Daniels, Lynch, Sullivan, and Schlegel were awarded the maximum amount of incentive-based compensation in 2013 by the Compensation Committee, which included Defendants Roper, Brock, and Robinson. This compensation was unjust because the Company's profit margins were only achieved by the unlawful sourcing of wood from China and other places.

164.    Moreover, egregiously, the Compensation Committee actually increased the maximum incentive-based compensation for Defendants Terrell, Daniels, Lynch, and Schlegel in 2013 to allow them to fully capitalize on the Company's unlawfully inflated profits.    As disclosed in the Company's Proxy Statement:

- The Compensation Committee identified an opportunity to modify the approach to cash bonuses because the annual cash bonus had historically limited the upside potential to reward outstanding performance and appeared uncompetitive in the marketplace.    Accordingly, with the exception of Mr. Sullivan, *we increased the maximum potential annual cash bonus awards that our executives could achieve in 2013 from 120% of their bonus target to 200% of their bonus target* in order to incent and reward exceptional results.

165.    After they raised the ceiling on the maximum permissible payout to Defendants Terrell, Daniels, Lynch, and Schlegel, the Compensation Committee awarded the full 200% bonus to all such defendants.

166.    For the 2013 Bonus Plan, the Compensation Committee determined that operating income represented the most comprehensive financial measure in evaluating executive performance.  A scale was established which set percentages of the target bonuses that would be paid out depending on the Company's actual operating income for the year.  The scale was designed to provide incentive bonuses for superior achievement, while being consistent with the Compensation Committee's views on the appropriate levels of total compensation.  The applicable scale for 2013 is set forth below:

<u>Triggers for 2013 Incentive-Based Compensation</u>

| Actual 2013 Operating Income | Percentage of Target Bonus |
|---|---|
| Below $78,346,010 | Zero |
| $78,346,010 – $82,263,310 | 25% |
| $82,263,311 – $86,180,610 | 50% |
| $86,180,611 – $90,097,126 | 75% |
| $90,097,127 – $93,231,751 | 100% |
| $93,231,752 – $96,365,591 | 125% |
| $96,365,592 – $99,499,432 | 150% |
| $99,499,433 – $101,852,763 | 175% |
| Above $101,852,763 | 200% |

In 2013, our actual operating income was $126,022,580.  Accordingly, Bonus Plan participants were awarded 200% of their respective Target Bonuses. Specifically, the following sets forth the Target Bonus for our named executive officers and the amounts awarded and paid to each under the Bonus Plan for 2013:

| Executive | 2013 Base Salary[1] ($) | Target Bonus Percentage | Target Bonus Amount ($) | Percentage of Target Bonus Awarded for 2013 | Bonus Amount Awarded for 2013[2] ($) |
|---|---|---|---|---|---|
| Mr. Lynch | 675,000 | 100% | 675,000 | 200% | 1,350,000 |
| Mr. Terrell | 341,649 | 60% | 204,989 | 200% | 409,979 |
| Mr. Schlegel | 368,842 | 60% | 221,305 | 200% | 442,610 |
| Mr. Pescara | 312,914 | 60% | 187,748 | 200% | 375,497 |
| Mr. Daniels | 302,328 | 60% | 181,397 | 200% | 362,794 |

167.   For 2012, the Compensation Committee had similarly raised the maximum amount of potential incentive-based compensation for Defendants Lynch, Terrell, Daniels, and Schlegel from 120% to 200% of base salary: "Additionally, with the exception of Mr. Sullivan, we increased the maximum potential annual cash bonus awards that our executives may achieve in 2012 from 120% of their bonus target to 200% of their bonus target in order to incent and reward outstanding performance."

168.   The   Compensation   Committee   approved   the   following   incentive-based compensation for 2012:

| Executive | 2012 Base Salary(1)($) | Target Bonus Percentage | Target Bonus Amount($) | Percentage of Target Bonus Awarded for 2012 | Bonus Amount Awarded for 2012(2)($) |
|---|---|---|---|---|---|
| Mr. Lynch | 575,000 | 100% | 575,000 | 113.8% | 654,063 |
| Mr. Terrell | 294,525 | 60% | 176,715 | 112.5% | 198,804 |
| Mr. Sullivan | 330,939 | 100% | 330,939 | 113.7% | 376,443 |
| Mr. Schlegel | 316,250 | 50% | 158,125 | 113.5% | 179,472 |

169.   The 2012 payouts were based on criteria which included earnings per share ("EPS") goals for the Company.   Because the Company exceeded the maximum target EPS established by the Compensation Committee, Defendants Lynch, Terrell, Sullivan, and Schlegel earned the full 120% for the "corporate performance" aspect of the compensation matrix:

> For the corporate performance goal in 2012, the Compensation Committee determined that diluted earnings per share ("EPS"), exclusive of non-recurring items, represented the most comprehensive financial measure in evaluating executive performance.   A scale was established which set percentages of the corporate performance component that would be paid out depending on our actual EPS for the year.   The scale was designed to provide incentive bonuses for superior achievement, while being consistent with the Compensation Committee's views on the appropriate levels of total compensation.   The applicable scale for 2012 is set forth below:

| Actual 2012 EPS | Corporate Performance Award Percentage |
|---|---|
| Below $1.00 | Zero |
| $1.10 – $1.02 | 25% |
| $1.03 – $1.07 | 50% |
| $1.08 – $1.14 | 75% |
| $1.15 – $1.25 | 100% |
| $1.26 – $1.37 | 110% |
| Above $1.37 | 120% |

This compensation, however, was unjust and unearned because the Company's successful financial results were based on false and misleading statements.

## FIDUCIARY DUTIES OF THE DEFENDANTS

170.    By reason of their positions as officers, directors and/or fiduciaries of Lumber Liquidators and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe Lumber Liquidators and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lumber Liquidators in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

171.    Each director and officer of the Company owes to Lumber Liquidators and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

172.    To discharge their duties, the officers and directors of Lumber Liquidators were required to exercise reasonable and prudent supervision over the management, policies,

practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Lumber Liquidators were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

173.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lumber Liquidators, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also

officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Lumber Liquidators' Board at all relevant times.

174. At times relevant hereto, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.

## AUDIT COMMITTEE DUTIES

175. In addition to their duties as members of the Board, the members of the Audit Committee owed specific duties to Lumber Liquidators under the Audit Committee Charter, including the duties to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls.

176. The purpose of the Audit Committee has been to assist the Board in fulfilling its oversight responsibilities. Its primary duties and responsibilities include (among others):

. . .

F. *Oversight of Internal Control over Financial Reporting.* The Committee shall review with management, the head of internal audit (or the internal audit service providers) and the independent auditors the Company's overall system of internal control, including management's annual assessment of the Company's internal control over financial reporting and the related report issued by the independent auditors. The Committee shall also review with management, the head of internal audit (or the internal audit service providers) and the independent auditors. . . .:

(i) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting;

(ii) any fraud (regardless of materiality) involving management or other employees having a significant role in internal controls over financial reporting; and

(iii) changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting.

G. *Review of Disclosure Controls and Procedures.* The Committee shall review with the Chief Executive Officer, the Chief Financial Officer and the General Corporate Counsel the Company's disclosure controls and procedures and shall review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any significant deficiencies in, or material non-compliance with, such disclosure controls and procedures.

H. *Review of Annual SEC Filings.* The Committee shall review with management and the independent auditors the financial information to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments made in the preparation of the financial statements, the clarity of the disclosures therein and the adequacy of internal controls. The Committee shall also discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee may discuss with the national office of the independent auditors issues on which it was consulted by the Company's audit team and matters of audit quality and consistency. Based on such review and discussion, the Committee shall determine whether to recommend to the Board of Directors that the audited financial statements be included in the Company's Form 10-K.

I. *Review of Quarterly SEC Filings.* The Committee shall review and discuss with management and the independent auditors the quarterly financial information to be included in the Company's Quarterly Reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and shall discuss any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee shall also discuss the results of the independent auditors' review of the Company's quarterly financial information conducted in accordance with applicable standards of the PCAOB (United States).

J. *Review of Certain Other Communications.* The Committee shall review the Company's earnings press releases and financial information and earnings guidance, including non-GAAP financial measures, periodically provided to analysts and rating agencies (which may consist of a discussion of the types of information to be provided and types of presentation to be made) to the extent required by applicable law or listing standards. [and]

K. *Review of Certain Matters with Management and the Independent Auditors.* The Committee shall review periodically with management and the independent auditors:

(i)    significant financial reporting issues, including material changes in the Company's selection or application of accounting principles and the effects of alternative applications of accounting principles on the Company's financial statements; and

(ii)    the effect of new or proposed regulatory and accounting initiatives on the Company's financial statements and other public disclosures. . . .

177.    Upon information and belief, throughout the Relevant Period, the Company maintained an Audit Committee Charter (or charters) that was (or were) materially and substantially the same in substance as the Company's current Audit Committee Charter described herein.

## CONTROL, ACCESS, AND AUTHORITY

178.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lumber Liquidators.

179.    Because of their advisory, executive, managerial, and directorial positions with Lumber Liquidators, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Lumber Liquidators, including information regarding the fact that the Company's above-market profit margins were the result of buying tainted wood and not from any lawful "sourcing initiatives" implemented by the Company.

180.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

## REASONABLE AND PRUDENT SUPERVISION

181. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lumber Liquidators were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e) remain informed as to how Lumber Liquidators conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f) ensure Lumber Liquidators operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

182.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing or reckless violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to Lumber Liquidators and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Lumber Liquidators.

183.    The Individual Defendants each breached their duties of loyalty and good faith by causing the Company to make false and/or misleading statements and/or to fail to disclose: (a) the Company overstated its revenues, profits, and gross margins by falsely representing that its wood was lawfully sourced and complied with standards promulgated by the CARB, when in fact the Company illegally sourced its wood directly from mills whose wood was not lawfully sourced and was not CARB-compliant; (b) the Company's financial results were overstated because of its failure to comply with federal and state laws; (c) the Company failed to maintain adequate systems of internal operational and financial controls; and (d) the Individual Defendants lacked a basis for their false statements about the Company's compliance with federal and state rules and regulations and about the Company's prospects and growth. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of (i) class action lawsuits that allege violations of the federal securities laws; (ii) investigations by federal and state regulatory agencies; and (iii) consumer class actions alleging false advertising, unfair business practices, violation of consumer

protection laws, and other claims.  As a result, Lumber Liquidators has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

184.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

185.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) the Company overstated its revenues, profits, and gross margins by falsely representing that its wood was lawfully sourced and complied with standards promulgated by the CARB, when in fact the Company illegally sourced its wood directly from mills whose wood was not lawfully sourced and was not CARB-compliant; (b) the Company's financial results were overstated because of its failure to comply with federal and state laws; (c) the Company failed to maintain adequate systems of internal operational and financial controls; and (d) the Individual Defendants lacked a basis for their false statements about the Company's compliance with federal and state rules and regulations and about the Company's prospects and growth.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein and benefitted themselves financially by selling Lumber Liquidators stock at inflated prices and/or receiving incentive-based compensation which was tied to Lumber Liquidators' financial results.

186.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false financial results.

187.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (b) disguise and misrepresent the Company's financial results and future business prospects; and (c) benefit themselves financially in an unjust and unlawful manner.

188.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the Board's authority, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

189.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO LUMBER LIQUIDATORS

190.   Due to the wrongdoing committed by the Individual Defendants, Lumber Liquidators has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  Further, as a direct and proximate result of the Individual Defendants' conduct, Lumber Liquidators has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a) legal fees, settlements, and judgments in the litany of lawsuits filed against the Company for violations of federal and state rules and regulations, the federal securities laws, other federal and state laws and regulations, and the common law;

(b) legal fees, costs, and settlements and/or judgments relating to the investigations of the DOJ and other federal and state agencies;

(c) reduced revenues and profits due to noncompliance with federal and state rules and regulations;

(d) loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(e) amounts paid to outside lawyers, accountants, and investigators in connection with the plethora of lawsuits filed against Lumber Liquidators; and

(f) loss of revenues and profits due to the Individual Defendants' wrongdoing and penalties by the government due to violations of law.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY ALLEGATIONS

191. Plaintiff brings this action for the benefit of Lumber Liquidators to redress injuries caused by the Individual Defendants as a result of the Individual Defendants' violations of law, as well as the aiding and abetting thereof. Lumber Liquidators is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

192. Plaintiff is and has been a Lumber Liquidators shareholder at all relevant times. Plaintiff therefore will adequately and fairly represent the interests of Lumber Liquidators in enforcing and prosecuting its rights.

193. Plaintiff has not made any demand on stockholders of Lumber Liquidators to institute this action since such demand would be a futile and useless act for the following reasons:

a. Lumber Liquidators is a publicly traded company with thousands of stockholders of record;

b. Making demand on such a number of stockholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Lumber Liquidators stockholders; and

194. Making demand on all stockholders would force Plaintiff to incur excessive expense and obstacles, assuming all stockholders could even be individually identified with any degree of certainty.

195. A pre-suit demand on the Lumber Liquidators Board is futile, and therefore, excused. The Board of Lumber Liquidators as of the filing of this complaint consists of the following nine individuals: Defendants Brock, Lynch, Moore, Presley, Robinson, Roper, Sullivan, Taylor, and Wade.

196. Demand is futile as to Brock, Lynch, Moore, Presley, Robinson, Roper, Sullivan, Taylor, and Wade because they all directly participated in the wrongdoing alleged herein.

**A. Demand Is Futile as to Defendant Lynch**

197. Demand is futile as to Lynch, as the Company admits Lynch does not meet the standards for director independence given his employment at the Company as President and CEO. Lynch is also interested, and therefore not independent or disinterested, because he has financially benefitted from his wrongdoing. During 2013, when Lynch was making false and misleading statements to inflate the Company's stock price, he reaped the benefit of his wrongdoing by being awarded huge compensation due to the allegedly strong performance of the

Company that year.  As President and CEO at Lumber Liquidators, Lynch made $6,866,883 in total compensation in 2013.  Of this total, $655,769 was received as a salary, $1,350,000 was received as a bonus, $3,374,996 was received in stock options, $1,469,911 was awarded as stock, and $16,207 came from other types of compensation.  This information is according to proxy statements filed for the 2013 fiscal year.

198.   Demand is also futile as to Lynch because Lynch is interested.  He is a named defendant in the related securities fraud class action complaint — *Kiken v. Lumber Liquidators Holdings, Inc.*, No. 4:13-cv-00157-AWA-DEM (E.D. Va.).   Lynch directly participated in making many of the statements alleged to be false and misleading and is alleged to have acted with scienter.  If Lynch is found liable in the securities fraud class action complaint, then the Company will be liable for securities fraud under Section 20A of the Securities Exchange Act of 1934 and under theories of respondeat superior.

199.   Moreover, as a board member, Lynch cannot independently consider a demand that the Company bring suit against Lynch because Lynch is heavily and personally interested in such decision due to being a named defendant in the 10b-5 class action case.  Liability in the 10b-5 case would also run the risk that Lynch could be barred by the SEC from serving as an officer or director at any publicly-traded company, thus endangering Lynch's livelihood.

**B.     Demand is Futile as to Defendant Sullivan**

200.   Demand is futile as to Sullivan because Sullivan is not independent and objective. He is the Company's founder and has been Chairman of the Board since the Company's inception in 1994. More importantly, Sullivan had direct knowledge of the Company's unlawful sourcing of wood from mills in China.  The Company's website notes Sullivan's direct involvement in the Company's sourcing initiatives:   "He [Sullivan] currently advises and supports our marketing and advertising departments and *is active in our sourcing initiatives*. He

is involved with employee development initiatives and plays a key role in setting and maintaining our corporate culture." Moreover, the Company's 2014 Proxy Statement also concedes Mr. Sullivan's involvement in executive-level, CEO-type decision, and as a result Lumber Liquidators admits that Sullivan does not meet standards for director independence: "Under the current structure, both the chairman and chief executive officer have responsibility for our business strategy and financial performance. Our chairman focuses on strategic matters relating to our marketing efforts and certain merchandising opportunities, while the chief executive officer is responsible for our operations and day-to-day management direction and execution." *See* Lumber Liquidators' 2014 Proxy Statement on Form 14A, at p. 6.

201.    Sullivan is also not independent and disinterested because he owns the real estate the Company leases as its main offices in Virginia. As disclosed in the Company's 2014 Proxy Statement:

> As of March 31, 2014, we lease our Toano finishing, distribution and headquarters facility, which includes a store location, supplemental warehouse space adjacent to one of our store locations and 28 of our other store locations from F9 Properties, LLC f/k/a ANO, LLC ('F9'), a company that is wholly owned by Mr. Sullivan. The operating lease for our Toano facility has a base period that runs through December 31, 2019. Our store leases generally have five-year base periods and one or more five-year renewal periods. Our rent expense attributable to F9 was $2.9 million in 2013 and we expect a similar rent expense attributable to F9 in 2014. The future minimum payments under our leases with F9 as of December 31, 2013 total approximately $14.2 million."

202.    Thus, Defendants Brock, Lynch, Moore, Presley, Robinson, Roper, Taylor, and Wade cannot objectively consider a demand to sue Sullivan because doing so would pose a threat of jeopardizing the Company's lease from Sullivan's company.

## C.    Defendants Sullivan, Lynch, Brock, Robinson, Taylor, Presley, Moore, Roper, and Wade Are Interested Because They Acted in Bad Faith

203.    As demonstrated in this complaint, the entire Board knew or recklessly disregarded the fact that Lumber Liquidators was buying wood from China and Russia that was

unlawfully sourced and which had unlawfully high levels of formaldehyde. Because hardwood flooring is the Company's only product, the Directors are charged with knowledge of key facts concerning the Company's hardwood flooring under the "core product" doctrine.

204. Moreover, the Director Defendants all ignored red flags demonstrating that the wood the Company was buying directly from mills in China was not CARB-2 compliant. First, the market price for CARB-2 compliant wood was significantly higher than the price Lumber Liquidators was paying. The Director Defendants cannot bury their heads in the sand and pretend that they knew nothing in light of the significant disparity between the prices of CARB-2 compliant and non-compliant wood. Just as someone who buys a Gucci handbag for $100 in Tijuana cannot profess ignorance that it was a fake, the Director Defendants cannot profess ignorance that the wood the Company was buying from China was not CARB-2 compliant in light of the artificially low prices the Company paid for such wood.

205. Indeed, as the *60 Minutes* exposé revealed, all one had to do to discover the fact that the wood was not CARB-2 compliant was go to the mills in China. The workers there readily admitted that the wood was not CARB-2 compliant and that they just slapped a CARB-2 compliant sticker on the wood. Moreover, the Director Defendants repeatedly caused Lumber Liquidators to represent in SEC filings during the Relevant Period that the Company sent its own quality control employees to China to inspect the wood being bought directly by Lumber Liquidators from the mills. As late as November 2014, Lumber Liquidators heavily emphasized this fact in presentations to investors, bragging: "[Our] products are the BEST in their categories, led by our flagship Bellawood; *significant investment in quality control and assurance around the world, including 60 professionals in the U.S., China and South America monitoring daily, most often at the mill.*" Such employees would have discovered the same

thing the *60 Minutes* crew discovered, especially because the Company's employees regularly visited the mills, not just on one or two occasions.

206.    Moreover, as noted *supra*, Defendant Sullivan, a director, was heavily and directly involved in the Company's sourcing initiatives and, as a result, regularly traveled to China during the Relevant Period and visited the mills. He thus had direct knowledge of the fact that the wood Lumber Liquidators was buying was not CARB-2 compliant. He made regular reports to the entire Board about the Company's sourcing initiatives and thus, upon information and belief, advised the Board of the results of his observations from China.

207.    Moreover, during the Relevant Period, several public reports and articles alleged that Lumber Liquidators was unlawfully sourcing hardwood from China and the Russian Far East. Upon information and belief, those articles and reports, as well as complaints to the California Air Resources Board·regarding the significantly excessive amounts of formaldehyde in the wood, were brought to the attention of Lumber Liquidators' Board, thus giving the directors actual knowledge of the wrongdoing.

208.    Another red flag that was consciously or recklessly ignored by the Board was the Company's highly unusual profit margins compared to Lowe's and Home Depot. As demonstrated more particularly in this complaint, the Company's profit margins were almost identical to its largest competitors from 2007 through 2011. In 2012 through 2014, however, the Company's profit margins significantly increased and significantly exceeded those of Home Depot and Lowe's. There was no rational explanation for this due to the fact that the Company sells a commodity. The Director Defendants caused the Company to issue multiple false and misleading statements during the Relevant Period improperly attributing the increased margins to the Company's "sourcing initiatives" being spearheaded by Defendant Sullivan. However, as

indicated herein, this explanation was false and made no economic or rational sense because the Company's competitors (Home Depot and Lowe's) were larger and had a lower cost structure than Lumber Liquidators. This was known intimately by the Director Defendants because, again, hardwood flooring is not only the Company's core product; it is the Company's *only* product. The Director Defendants knew the Company's alleged "sourcing initiative" could not reduce costs to such an extent as to permit Lumber Liquidators to suddenly and substantially increase its profit margins far in excess of those of Home Depot and Lowe's. Because they consciously or recklessly ignored this red flag, the Director Defendants acted in bad faith and are not entitled to the protection of the business judgment rule. Demand is futile if it is shown that the directors' conduct is not protected by the business judgment rule.

**D.     Demand Is Futile as to All Defendants with Respect to Suing Defendant Lynch**

209.   Demand is futile as to Lynch because he would lose his severance payments were he to agree to sue himself for insider trading, unjust enrichment, and breach of fiduciary duty. Even if Lynch could theoretically objectively consider a demand to sue himself, and even if the Company would pursue an action against Lynch, while at the same time firing him "without cause" instead of "for cause," further practicalities under Lynch's employment agreement demonstrate that Lynch would never vote to sue himself. Even if Lynch were fired "without cause," his employment agreement requires that, to be entitled to his significant severance benefits, Lynch is required to execute a release of all claims against Lumber Liquidators. Lynch's employment agreement specifically states:

> *The making of any severance payments or the providing of any benefits as set forth in this Section 1.4(h) is strictly conditioned upon (a) the Employee executing a release of the Company, its subsidiaries and affiliates, its officers, directors and employees, and its and their respective successors* within the 60 day period commencing on Employee's termination of employment and (b) Employee's continued compliance with the provisions of Article III.

210. Thus, even if the Board could in theory objectively consider a demand to sue Lynch, and theoretically did so and fired Lynch "without cause," Lynch would never release Lumber Liquidators from any and all claims since Lumber Liquidators would be suing him. No competent attorney would advise Lynch to release Lumber Liquidators from any and all claims at the very time Lynch was being sued by Lumber Liquidators for breach of fiduciary duty. Doing so would eliminate any defense Lynch had in the lawsuit. Thus, neither Lynch nor any other Board member can objectively consider a demand to sue Lynch.

211. Moreover, demand is futile as to all the Director Defendants with respect to the decision of whether to sue Lynch due to unique and restrictive terms of Lynch's employment agreement, which guarantees Lynch's employment through January 2016. Such terms make it highly unlikely that the Company would ever sue Lynch, thus demonstrating the futility of making any demand that the Company sue Lynch. A claim brought derivatively by a shareholder against Lynch, on the other hand, is not encumbered by such restrictions and thus is a better course for Lumber Liquidators. Specifically, Lynch has employment agreements with Lumber Liquidators that contain a very narrow and restrictive definition of the circumstances under which Lumber Liquidators may terminate the employment of Lynch "for cause." For example, the agreements limit a termination "for cause" to circumstances where the executive has engaged in "willful dishonesty, fraud, misconduct, or gross negligence with respect to the business or affairs of the Company." These restrictions are very narrow and severely limit the ability of the Company to fire Lynch "for cause." Notably, the definition of "for cause" in the employment agreements does not even state that the Company can fire Lynch for cause even if he has engaged in self-dealing, such as is alleged herein.

212.    As further evidence that any demand on the Board to sue Lynch would be futile, if the Company fires Lynch and the termination does not meet the narrow grounds constituting "for cause," then the Company is liable to pay Lynch his full salary for twelve months, as well as full medical and dental benefits.  As demonstrated *supra*, given Lynch's lavish and above-market compensation, the payment of this large termination fee would represent a significant liability for the Company.

**E.      Defendants Presley, Moore, Roper, and Wade Are Interested Because They Face a Substantial Likelihood of Liability As Audit Committee Members**

213.    Defendants Presley, Moore, Roper, and Wade are the current members of the Audit Committee, and were also members of the Audit Committee throughout the Relevant Period.  As Audit Committee members, as also detailed in ¶¶ 175-177 above, they were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, and for overseeing Lumber Liquidators' internal controls over financial reporting. Despite these duties, these defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance.

214.    During the Relevant Period, Defendants Presley, Moore, Roper, and Wade had actual knowledge that Lumber Liquidators' internal controls were inadequate and that Lumber Liquidators' business was violating various federal and state laws.  Knowing and/or reckless conduct by a director constitutes bad faith and is not entitled to the protection of the business judgment rule.  Thus, demand is futile.

215.    Specifically, in 2013, Lumber Liquidators' Board met five times; the Audit Committee met six times and took additional actions by uniform written consent.  Throughout such time, including at some of the Board meetings, upon information and belief, Defendants

Presley, Moore, Roper, and Wade were provided with detailed reports from Defendant Sullivan and from Lumber Liquidators' Compliance Officer regarding the Company's sourcing initiative, including facts which caused the Audit Committee to know or recklessly disregard the fact that Lumber Liquidators was buying unlawfully sourced and non-CARB compliant wood.

216. Moreover, because Lumber Liquidators sources its wood directly from mills, mostly from China, the Company deals directly with its mills and does not go through middlemen or distributors. The Audit Committee charter requires its members to meet with and get direct reports from the Company's senior management, including those individuals directly responsible for buying wood from the mills in China. Defendants Presley, Moore, Roper, and Wade thus have direct knowledge of and communication with the mills.

217. Due to the reports they received regarding the mills in China, together with the fact that Lumber Liquidators operates as a single business segment and thus the wood that the Company buys and sells is the Company's "core product," Defendants Presley, Moore, Roper, and Wade knew or recklessly disregarded the fact that Lumber Liquidators' above-market profit margins were the result of buying tainted wood (whose price was below market precisely because it was obtained through unlawful sourcing or manufacturing) and not from any lawful "sourcing initiatives" implemented by the Company.

218. In fact, Defendants Presley, Moore, Roper, and Wade had actual knowledge of the market prices from China for wood that complied with regulations regarding formaldehyde promulgated by CARB, and knew that the below-market prices Lumber Liquidators was paying its mills could not be for truly CARB-compliant wood because truly CARB-compliant wood costs significantly more than what Lumber Liquidators was paying.

219.    The knowledge or reckless disregard of the truth possessed by the Audit Committee members is also demonstrated by the repeated red flags that they consciously ignored.  For example, it was certainly a red flag for all Defendants, including Presley, Moore, Roper, and Wade, when the Company was served with sealed search warrants at the Company's corporate offices in Toano and Richmond, Virginia by the DHS's Immigration and Customs Enforcement and the FWS on September 26, 2013.  Despite this red flag, the Individual Defendants caused the Company to immediately deny all wrongdoing regarding its sourcing methods.  The Director Defendants[2] caused the Company to issue a press release *the very next day* (September 27, 2013) stating: "Due to the scale of its international and domestic operations, Lumber Liquidators has policies and procedures in place for the sourcing, harvesting and manufacturing of its products designed to comply with federal and other regulations related to the importation of wood flooring products."

220.    Given the fact that the press release was issued the very next day after the Company's headquarters were raided pursuant to *sealed search warrants*, the Director Defendants obviously could not have informed themselves of all material facts regarding the Company's sourcing methods and regarding the Company's compliance "with federal and other regulations related to the importation of wood flooring products" because they approved the Company press release the next day, issuing a blanket denial.  Directors are required to fully inform themselves of all relevant facts before acting.  Failing to do so eliminates the protection of the business judgment rule and establishes demand futility.

---

[2] All Director Defendants were on the Board at this time except for Taylor, who did not join the Board until April 2014.  Thus, this allegation and those in the following paragraph apply to all Director Defendants except for Taylor.

221.    Moreover, between September 27, 2013 and March 1, 2015, when the *60 Minutes* story ran, the Director Defendants (including Defendants Presley, Moore, Roper, and Wade) did nothing to further investigate or correct the Company's purchase of non-CARB-compliant wood from mills in China. Instead, they consciously or recklessly allowed the Company to continue to purchase such wood, even after the government raids.

222.    On March 1, 2015, *60 Minutes* ran its full-length exposé detailing the Company's unlawful sourcing of lumber from China which contained unlawful levels of formaldehyde, backed by tests of the lumber performed by independent labs and admissions by workers at the Chinese mills that they were instructed to intentionally mislabel lumber ordered by Lumber Liquidators as compliant with CARB. The day after the *60 Minutes* story ran, the Director Defendants caused the Company to file a Form 8-K with the SEC stating:

> In light of Sunday night's 60 Minutes episode featuring Lumber Liquidators Holdings, Inc. ("the Company"), the Company is providing the following statement:
>
> "Lumber Liquidators is a leader in safety, as evidenced by our track record of providing our wide range of products to two million satisfied customers across America. *We comply with applicable regulations set by the California Air Resources Board ("CARB"), which is currently the only regulator of composite core emissions. Although the CARB regulations only apply in California, we adhere to these standards everywhere we do business.* Every manufacturer of fiberboard cores used in our products is certified in accordance with CARB regulations. We have documentation to support each step of our production process, including vendor agreements, vendor invoices, CARB certificates, and test results, to serve as further proof that our processes, practices and products are compliant across the board. Independent third-party test results are available on our safety website at www.lumberliquidators.com/safety.
>
> *We believe that 60 Minutes used an improper test method* in its reporting that is not included in CARB's regulations and does not measure a product according to how it is actually used by consumers. *Our laminate floors are completely safe to use as intended.*"

223. Again, since the Director Defendants caused the Company to issue this categorical denial just one day after the *60 Minutes* episode ran, the Director Defendants could not possibly have performed any investigation or fully informed themselves of all relevant facts concerning whether the Company's wood was CARB-compliant before issuing the blanket denial. Again, the failure to fully inform themselves eliminates the protection of the business judgment rule that is otherwise applicable to directors. The Director Defendants thus consciously abdicated their duties as directors of the Company. As a result, any demand upon them is futile.

224. Moreover, the ill-advised nature of the uninformed and knee-jerk filing of the Form 8-K on Monday, March 2, 2015, was made apparent when the Company was forced to withdraw just two days later from participation in the Raymond James Annual Institutional Investors Conference, a prominent conference that the Company had always attended. On March 4, 2015, the Company issued another Form 8-K attaching a press release which announced the Company's last-minute cancellation of its attendance at the Raymond James conference (scheduled for that day) and included the following comment from Defendant Lynch: "'We regret that we are not attending the conference today and apologize to our investors that planned to attend.'"

**F.   Defendants Roper, Brock, and Robinson Are Interested Because They Face a Substantial Likelihood of Liability as Compensation Committee Members**

225. Defendants Roper, Brock, and Robinson are the current members of the Compensation Committee. During the Relevant Period, they awarded excessive and unjust compensation to Defendants Terrell, Daniels, Lynch, Sullivan, and Schlegel. Despite having direct responsibility for decisions concerning the Company's sourcing of wood from China, Defendants Terrell, Daniels, Lynch, Sullivan, and Schlegel were awarded the maximum amount

of incentive-based compensation in 2013 by Defendants Roper, Brock, and Robinson. This compensation was unjust because the Company's profit margins were only achieved by the unlawful sourcing of wood from China and other places.

226. Moreover, egregiously, the Compensation Committee actually increased the maximum incentive-based compensation for Terrell, Daniels, Lynch, and Schlegel in 2013 to allow them to fully capitalize on the Company's unlawfully inflated profits. As disclosed in the Company's Proxy Statement:

> • The Compensation Committee identified an opportunity to modify the approach to cash bonuses because the annual cash bonus had historically limited the upside potential to reward outstanding performance and appeared uncompetitive in the marketplace. Accordingly, with the exception of Mr. Sullivan, *we increased the maximum potential annual cash bonus awards that our executives could achieve in 2013 from 120% of their bonus target to 200% of their bonus target* in order to incent and reward exceptional results.

227. After they raised the ceiling on the maximum permissible payout to Terrell, Daniels, Lynch, and Schlegel, the Compensation Committee awarded the full 200% bonus to all such defendants. Moreover, the Compensation Committee took its cue from Lynch himself, one of the chief wrongdoers, as admitted in the Proxy: "In early 2013, Mr. Lynch reviewed the base salary for each executive officer, including Mr. Sullivan and himself, and presented the Compensation Committee with recommendations regarding changes in the base salaries for such executive officers."

228. For the 2013 Bonus Plan, the Compensation Committee determined that operating income represented the most comprehensive financial measure in evaluating executive performance. A scale was established which set percentages of the target bonuses that would be paid out depending on the Company's actual operating income for the year. The scale was designed to provide incentive bonuses for superior achievement, while being consistent with the

Compensation Committee's views on the appropriate levels of total compensation.   The

applicable scale for 2013 is set forth below:

<u>Triggers for 2013 Incentive-Based Compensation</u>

| Actual 2013 Operating Income | Percentage of Target Bonus |
|---|---|
| Below $78,346,010 | Zero |
| $78,346,010 – $82,263,310 | 25% |
| $82,263,311– $86,180,610 | 50% |
| $86,180,611 – $90,097,126 | 75% |
| $90,097,127 – $93,231,751 | 100% |
| $93,231,752 – $96,365,591 | 125% |
| $96,365,592 – $99,499,432 | 150% |
| $99,499,433 – $101,852,763 | 175% |
| Above $101,852,763 | 200% |

In 2013, our actual operating income was $126,022,580.  Accordingly, Bonus Plan participants were awarded 200% of their respective Target Bonuses. Specifically, the following sets forth the Target Bonus for our named executive officers and the amounts awarded and paid to each under the Bonus Plan for 2013:

| Executive | 2013 Base Salary[1] ($) | Target Bonus Percentage | Target Bonus Amount ($) | Percentage of Target Bonus Awarded for 2013 | Bonus Amount Awarded for 2013[2] ($) |
|---|---|---|---|---|---|
| Mr. Lynch | 675,000 | 100% | 675,000 | 200% | 1,350,000 |
| Mr. Terrell | 341,649 | 60% | 204,989 | 200% | 409,979 |
| Mr. Schlegel | 368,842 | 60% | 221,305 | 200% | 442,610 |
| Mr. Pescara | 312,914 | 60% | 187,748 | 200% | 375,497 |
| Mr. Daniels | 302,328 | 60% | 181,397 | 200% | 362,794 |

228.   For 2012, the Compensation Committee had similarly raised the maximum

amount of potential incentive-based compensation for Lynch, Terrell, Daniels, and Schlegel from

120% to 200% of base salary: "Additionally, with the exception of Mr. Sullivan, we increased

the maximum potential annual cash bonus awards that our executives may achieve in 2012 from

- 81 -

120% of their bonus target to 200% of their bonus target in order to incent and reward outstanding performance."

229.    The   Compensation   Committee   approved   the   following   incentive-based compensation for 2012:

| Executive | 2012 Base Salary(1)($) | Target Bonus Percentage | Target Bonus Amount($) | Percentage of Target Bonus Awarded for 2012 | Bonus Amount Awarded for 2012(2)($) |
|---|---|---|---|---|---|
| Mr. Lynch | 575,000 | 100% | 575,000 | 113.8% | 654,063 |
| Mr. Terrell | 294,525 | 60% | 176,715 | 112.5% | 198,804 |
| Mr. Sullivan | 330,939 | 100% | 330,939 | 113.7% | 376,443 |
| Mr. Schlegel | 316,250 | 50% | 158,125 | 113.5% | 179,472 |

230.    For 2012, the Compensation Committee also based its payouts largely upon the recommendation of Lynch, as stated in the Proxy: "Mr. Lynch provided the Compensation Committee with recommendations regarding the proposed payout for each named executive officer, including Mr. Sullivan and himself, under the personal goals component of the Bonus Plan.    His recommendations included an assessment of each named executive officer's performance against his personal goals and general contribution to the success of our operations."    The 2012 payouts were based on criteria which included earnings per share ("EPS") goals for the Company.    Because the Company exceeded the maximum target EPS established by the Committee, Lynch, Terrell, Sullivan, and Schlegel earned the full 120% for the "corporate performance" aspect of the compensation matrix:

> For the corporate performance goal in 2012, the Compensation Committee determined that diluted earnings per share ("EPS"), exclusive of non-recurring items, represented the most comprehensive financial measure in evaluating executive performance.    A scale was established which set percentages of the corporate performance component that would be paid out depending on our actual EPS for the year.    The scale was designed to provide incentive bonuses for superior achievement, while being consistent with the Compensation Committee's views on the appropriate levels of total compensation.    The applicable scale for 2012 is set forth below:

| Actual 2012 EPS | Corporate Performance Award Percentage |
|---|---|
| Below $1.00 | Zero |
| $1.10 – $1.02 | 25% |
| $1.03 – $1.07 | 50% |
| $1.08 – $1.14 | 75% |
| $1.15 – $1.25 | 100% |
| $1.26 – $1.37 | 110% |
| Above $1.37 | 120% |

In 2012, our actual EPS was $1.68 per share.  Accordingly, 120% of the corporate performance component of the Bonus Plan was awarded to the Bonus Plan participants.

**E.     Demand is Futile as to all Director Defendants Because They Face a Substantial Likelihood of Liability for Breaching Their Duty of Candor**

231.    The Director Defendants were responsible for reviewing and approving the Company's financial statements.   By authorizing the false financial statements and public statements alleged herein which were made beginning in 2012, by signing the annual reports on Forms 10-K filed with the SEC during the Relevant Period, and by failing to correct other statements which the Officer Defendants made during such time, the Director Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws and an investigation by the DOJ.   A director's breach of the duty of candor is not entitled to protection under the business judgment rule.   As a result, any demand upon the Director Defendants to bring suit against themselves or the Officer Defendants would be a useless and futile act.

232.    All the Director Defendants face a substantial likelihood of liability for causing Lumber Liquidators to engage in *illegal and unlawful conduct*.   The DOJ and other federal agencies are investigating the Company for violations of federal law.   The business judgment rule protects a wide variety of business decisions, but does not protect a corporation's officers and directors from causing a company to engage in illegal and unlawful conduct.   Here,

hardwood flooring accounted for 100% of Lumber Liquidators' revenues during the Relevant Period and was the Company's core (and indeed, sole) product. The Director Defendants were specifically responsible for ensuring Lumber Liquidators had adequate internal controls regarding the Company's compliance with federal and state rules and regulations regarding its hardwood flooring. Thus, the Director Defendants are directly responsible for Lumber Liquidators' failure to adopt and implement such internal controls, and for the substantial damages Lumber Liquidators is subject to in the ongoing lawsuits and investigations. As such, all the Director Defendants face a substantial likelihood of liability for the claims asserted herein. Demand is therefore futile.

233. As alleged herein, all the Director Defendants had actual knowledge, or recklessly disregarded, the Company's violations of federal and state rules and regulations and Lumber Liquidators' lack of adequate internal controls. Far from constituting mere "red flags," the information available to the Director Defendants during the Relevant Period demonstrates *actual knowledge* or reckless disregard of the Company's violation of law due to the numerous lawsuits and subpoenas Lumber Liquidators received during the Relevant Period, which were discussed by the Director Defendants in Lumber Liquidators' Forms 10-K filed with the SEC and signed by each Director Defendant, except for Defendant Taylor. A director's knowing or reckless breach of fiduciary duty constitutes bad faith under Delaware law. Bad faith conduct is not protected under the business judgment rule. Thus, demand is excused as to all Director Defendants.

234. As particularized herein, to properly prosecute this lawsuit, Lumber Liquidators' directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.

This they will not do. A majority of the defendants are exposed to potential liability for operating Lumber Liquidators without the internal controls for compliance that would have detected and prevented the improper misrepresentations to shareholders and violations of federal and state regulations that have occurred over an extended period of time. Thus, demand on the Director Defendants is futile, and therefore, excused.

235. The Director Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Likewise, these defendants have and will continue to receive substantial remuneration predicated upon Lumber Liquidators' results. The acts complained of herein have resulted in economic benefits to defendants through their increased and continuing compensation – without corresponding recognition or accounting for the correlated liability and risk that Lumber Liquidators was subject to as a result of its lack of internal controls. The Director Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into Lumber Liquidators' balance sheet. Thus, demand on the Director Defendants is futile, and therefore, excused.

236. Demand on the Director Defendants is futile because when given an opportunity to undertake action to correct the violations of federal and state law by Lumber Liquidators, the Board did nothing and merely continued to falsely state in SEC filings that Lumber Liquidators was in full compliance with such laws and regulations.

237.    Lumber Liquidators' officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' ("D&O") liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lumber Liquidators. However, the D&O liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Lumber Liquidators against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Lumber Liquidators, there would be no D&O insurance protection and, thus, they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile, and therefore, excused.

## COUNT I
## Breach of Fiduciary Duty
## (Against All Defendants)

238.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lumber Liquidators' business and affairs, particularly with respect to issues fundamental to the Company's core (and, indeed sole) product – hardwood flooring – and the manner of how and from where it is sourced.

240.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Lumber Liquidators.

241. In breach of their fiduciary duties owed to Lumber Liquidators, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Lumber Liquidators' business, rendering them personally liable to the Company for breaching their fiduciary duties.

242. As a direct and proximate result of defendants' breaches of their fiduciary obligations, Lumber Liquidators has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### Abuse of Control
### (Against All Defendants)

243. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

244. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lumber Liquidators, for which they are legally responsible.

245. As a direct and proximate result of defendants' abuse of control, Lumber Liquidators has sustained significant damages. As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Lumber Liquidators has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III
### Gross Mismanagement
### (Against All Defendants)

246. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

247. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

with regard to prudently managing the assets and business of Lumber Liquidators in a manner consistent with the operations of a publicly held corporation.

248.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lumber Liquidators has sustained significant damages.

249.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

250.   Plaintiff on behalf of Lumber Liquidators has no adequate remedy at law.

## COUNT IV
### Unjust Enrichment
**(Against Defendants Terrell, Daniels, Lynch, Sullivan, and Schlegel)**

251.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252.   During the Relevant Period, Defendants received bonuses, stock options, and/or similar such compensation from Lumber Liquidators that were tied to the financial performance of Lumber Liquidators.  Defendants were unjustly enriched thereby.

253.   To remedy Defendants' unjust enrichment, this Court should order defendants to disgorge their unjustly obtained bonuses and compensation.

## COUNT V
### Insider Trading
**(Against Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel)**

254.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

255.   At the time Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel sold their Lumber Liquidators stock, they knew the information described above, and sold Lumber Liquidators stock on the basis of such information.

256.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.    It was a proprietary asset belonging to the Company, which Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel used for their own benefit when they sold the stock.

257.    At the time of their stock sales, Defendants knew that the Company's financial results were overstated due to the false and misleading statements alleged herein.  Their sales of Company stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

258.    Because the use of the Company's proprietary information for their own gain constitutes a breach of fiduciary duties of loyalty and good faith, the Company is entitled to the imposition of a constructive trust on any profits that Defendants Sullivan, Lynch, Presley, Moore, Daniels, and Schlegel obtained thereby.

259.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Lumber Liquidators and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lumber Liquidators;

C.    Determining and awarding to Lumber Liquidators the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.      Directing Lumber Liquidators and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lumber Liquidators and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Certification of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.      A proposal to improve the Company's internal controls regarding compliance with federal and state regulations affecting hardwood flooring;

2.      A proposal to appoint an independent Chairman of the Board for the Company; and

3. ·    A proposal to add two additional members to the Board who are financial experts under Sarbanes-Oxley and who have experience in compliance with federal and state regulations affecting the Company's operations.

E.      Determining and awarding to Lumber Liquidators exemplary damages in an amount necessary to punish Individual Defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding Lumber Liquidators restitution from defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 31, 2015

Respectfully submitted,

MICHIE HAMLETT LLP
David W. Thomas (Virginia Bar No. 73700)
Kyle McNew (Virginia Bar No. 73210)

_____
E. Kyle McNew, Esq.

500 Court Square, Suite 300
Charlottesville, Virginia  22902
Telephone:  (434) 951-7200
Facsimile:  (434) 951-7218


JOHNSON & WEAVER, LLP
FRANK J. JOHNSON, ESQ.
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone: 619/230-0063
619/255-1856 (fax)

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR., ESQ.
40 Powder Springs Street
Marietta, GA  30064
Telephone: 770/200-3104

*Attorneys for Plaintiff*

DocuSign Envelope ID: B08A04AF-9DEF-4AA7-9D0B-90E72DA51910

## VERIFICATION

I, Phuc Doan, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: March 25, 2015

*Phuc Doan*
090E4630A8B342D...

(Signature of Phuc Doan)